## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **MARQUEZ ANTONIO JACKSON**<br>*Individually and as the Personal*<br>*Representative of the Estate of Marquez*<br>*Antonio Parker*<br>**5114 East Capital Street NE**<br>**Washington, D.C. 20019**<br><br>**and**<br><br>**JEWEL PARKER**<br>**723 Bald Eagle Lane**<br>**Lusby, Maryland 20657**<br><br>    *Plaintiffs,*<br><br>  **v.**<br><br>**DISTRICT OF COLUMBIA**<br>**c/o Mayor and Office of the Attorney**<br>**General**<br>**400 6th Street, NW**<br>**Washington, D.C. 20001**<br><br>**and**<br><br>**DETECTIVE OLIVER C. LAKE**<br>*Individually and in his Official Capacity as*<br>*a Metropolitan Police Detective*<br>**3320 Idaho Avenue, NW**<br>**Washington, D.C. 20016**<br><br>**and**<br><br>**OFFICER ALICIA JENKINS**<br>*Individually and in her Official Capacity*<br>*as a Metropolitan Police Officer*<br>**3320 Idaho Avenue, NW**<br>**Washington, D.C. 20016**<br><br>**and** | **Civil Action No. 25-cv-889** |

**OFFICER LAVIDA DELOZIER**
*Individually and in her Official Capacity*
*as a Metropolitan Police Officer*
**3320 Idaho Avenue, NW**
**Washington, D.C. 20016**

**and**

**SERGEANT DENISE JACKSON**
*Individually and in her Official Capacity*
*as a Metropolitan Police Sergeant*
**3320 Idaho Avenue, NW**
**Washington, D.C. 20016**

**and**

**OFFICER JOHN DOE #1**
*Individually and in his Official Capacity as*
*a Metropolitan Police Officer*
**3320 Idaho Avenue, NW**
**Washington, D.C. 20016**

**and**

**CAPTAIN TATJANA SAVOY**
*Individually and in her Official Capacity*
*as a Metropolitan Police Captain*
**3320 Idaho Avenue, NW**
**Washington, D.C. 20016**

**and**

**SERGEANT ELIZABETH WONG**
*Individually and in his Official Capacity as*
*a Metropolitan Police Sergeant*
**3320 Idaho Avenue, NW**
**Washington, D.C. 20016**

**and**

**LT. RONALD BRIDGES**
*Individually and in his Official Capacity as*
*a Metropolitan Police Sergeant*
**3320 Idaho Avenue, NW**
**Washington, D.C. 20016**

## SUPPORTING EXHIBITS

# Exhibit A

# (Plaintiffs' Complaint)

eFiled
1/31/2025 6:44:41 PM
Superior Court
of the District of Columbia

IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

**MARQUEZ ANTONIO JACKSON**
*Individually and as the Personal Representative*
*of the Estate of Marquez Antonio Parker*
5114 East Capital Street NE
Washington, D.C. 20019

and

**JEWEL PARKER**
723 Bald Eagle Lane
Lusby, Maryland 20657

*Plaintiffs,*

vs.

**DISTRICT OF COLUMBIA**
c/o Mayor and Office of the Attorney General
400 6th Street NW
Washington, D.C. 20001

and

**DETECTIVE OLIVER C. LAKE**
*Individually and in his Official Capacity as*
*a Metropolitan Police Detective*
3320 Idaho Avenue NW
Washington, DC 20016

and

**OFFICER ALICIA JENKINS**
*Individually and in her Official Capacity as*
*a Metropolitan Police Officer*
3320 Idaho Avenue NW
Washington, DC 20016

and

**OFFICER LAVIDA DELOZIER**
*Individually and in her Official Capacity as*
*a Metropolitan Police Officer*

**\*Jury Trial Demanded\***

Civil Case No. 2025-CAB-000601

3320 Idaho Avenue NW
Washington, DC 20016

and

**SERGEANT DENISE JACKSON**
*Individually and in her Official Capacity as*
*a Metropolitan Police Sergeant*
3320 Idaho Avenue NW
Washington, DC 20016

and

**OFFICER JOHN DOE #1**
*Individually and in his Official Capacity as*
*a Metropolitan Police Officer*
3320 Idaho Avenue NW
Washington, DC 20016

and

**CAPTAIN TATJANA SAVOY**
*Individually and in her Official Capacity as*
*a Metropolitan Police Captain*
3320 Idaho Avenue NW
Washington, DC 20016

and

**SERGEANT ELIZABETH WONG**
*Individually and in his Official Capacity as*
*a Metropolitan Police Sergeant*
3320 Idaho Avenue NW
Washington, DC 20016

and

**LT. RONALD BRIDGES**
*Individually and in his Official Capacity as*
*a Metropolitan Police Sergeant*
3320 Idaho Avenue NW
Washington, DC 20016

*Defendants.*

## COMPLAINT AND JURY DEMAND

COMES NOW the Plaintiffs Marquez Antonio Jackson, *Individually and as the Personal Representative of the Estate of Marquez Antonio Parker*, and Jewel Parker, by and through attorneys Cary J. Hansel, Kristen M. Mack, and the law firm of Hansel Law, PC, and sues the above-named Defendants, and as cause therefore state as follows:

## INTRODUCTION

1.      This action arises from the preventable death of Marquez Antonio Parker ("**Mr. Parker**") while he was a pretrial detainee in the custody of the District of Columbia at the Second District Station of the Metropolitan Police Department.

2.      Mr. Parker was arrested and taken to Second District Station for processing.  At no time during his arrest or during his incarceration was a full custody search conducted on Mr. Parker.

3.      Mr. Parker was housed in cell #3.   Shortly after entering his cell, Mr. Parker covered the camera with toilet paper.  The camera remained completely covered for approximately four minutes.

4.      About three minutes after Mr. Parker removed the toilet paper from obscuring the CCTV camera in his cell, he became unsteady and teetered back and forth as he stood next to the cell's bed, scratching his hands and wrists.  After about a minute, he leaned on the bed and collapsed backwards.

5.      Mr. Parker's concerning behavior prior to collapsing on the bed was fully visible on the CCTV camera.  After he collapsed, the majority of his body was not visible on camera except for the lower portion of his right leg.

6.      About a minute after Mr. Parker collapsed, an MPD detective and a Special Agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") went to Cell #3 to collect Mr. Parker for an interview.  When they walked into Cell #3, they discovered Mr. Parker supine on the floor parallel to the cell's bunk with his feet pointing towards the cell door and his head pointing towards the wall.  The detective knocked on the cell door and called out to Mr. Parker. Mr. Parker's right foot moved slightly to the side.  The detective then unlocked the cell door, partially entered the cell, and grabbed Mr. Parker's right leg.  He shook Mr. Parker's leg for approximately ten seconds and received no response.  Upon receiving no response, the detective stepped out of the cell.  The detective and the ATF agent stood outside the cell for approximately 70 seconds staring inwards at Mr. Parker.  The detective then re-entered Cell #3, grabbed Mr. Parker's leg once more, and shook it for approximately twenty seconds, again receiving no response.  At the time, Mr. Parker was in MPD custody and the MPD detective the other defendant officers, as well as MPD and, ultimately, the District of Columbia, had a duty to ensure his wellbeing.

7.      Instead of taking steps to assess whether Mr. Parker was in need of first aid or medical intervention, the detective and ATF agent left Mr. Parker's cell and the cellblock without notifying anyone that Mr. Parker was lying in the floor nonresponsive and in obvious medical distress.

8.      No one entered the cellblock area again for almost another hour after this, and no one checked on Mr. Parker in particular for well over an hour, despite MPD's knowledge that Mr. Parker was in medical distress (creating a duty to immediately respond) and despite a duty to check at least every half of an hour under applicable policies.  It was not until an officer that was interacting with a different male prisoner in Cell #1 just happened to glance over and see Mr.

Parker laying on the floor that anyone offered him any assistance.  By then, it was too late and Mr. Parker died.

9.      On February 28, 2023, toxicology testing led to the determination that Mr. Parker's cause of death was the result of "combined toxic effects of cocaine, fentanyl, fluorofentanyl, and heroin."  Mr. Parker's autopsy determined that he had ingested Heroin within a little over an hour prior to his death, which would have caused the unsteadiness, unusual behavior, and collapse captured on the CCTV footage.

10.     Had Mr. Parker been properly searched, properly monitored, or had he received necessary medical treatment in a timely manner, Mr. Parker would still be alive today.

11.     Mr. Parker's death was caused by the deliberate indifference, unreasonableness, and negligence or gross negligence of the officers and staff at MPD employed by the District of Columbia.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to D.C. Code § 11-921, as the events and damages set forth herein occurred in the District of Columbia.

13.     D.C. Code § 12-309 has been satisfied.  Pursuant to D.C. Code § 12-309(a), a "report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section."  On January 26, 2024, the Internal Affairs Division of the Metropolitan Police Department issued a 77-page Final Investigative Report Concerning the In-Custody Death of Mr. Marquez Parker in the Second District Cellblock, which constitutes a written report completed in the regular course of duty sufficient to provide notice.  *See* Exhibit 1.

## PARTIES

14.     Plaintiff Marquez Antonio Jackson ("**Plaintiff Jackson**"), is the Personal Representative of the Estate of Marquez Antonio Parker and the biological son of Mr. Parker and an adult resident of Washington, D.C.

15.     Plaintiff Jewel Parker is the biological mother of Mr. Parker and an adult resident of Maryland.  She has an interest in this action as a wrongful death beneficiary.

16.     Defendant District of Columbia ("**Defendant District**") is the municipal government of the District of Columbia.  The District is capable of being sued as a municipal corporation pursuant to D.C. Code § 1-102.  Defendant District controls and operates the Metropolitan Police Department, through which Defendant District employed each of the Individual Defendants listed below.

17.     Detective Oliver C. Lake ("**Defendant Detective Lake**") was, at all times relevant to this Complaint, employed by the Metropolitan Police Department and acting in his official capacity as a police detective, under the authority and color of law and within the scope of his employment.  On February 2, 2023, Defendant Detective Lake acted as outlined below at the Second District police station located at 3320 Idaho Avenue NW, Washington, D.C. 20016, in his capacity as a detective assigned to the Second District Detective's Unit.

18.     Officer Alicia Jenkins ("**Defendant Officer Jenkins**") was, at all times relevant to this Complaint, employed by the Metropolitan Police Department and acting in her official capacity as a police officer, under the authority and color of law and within the scope of her employment.  On February 2, 2023, Defendant Officer Jenkins acted as outlined below at the Second District police station located at 3320 Idaho Avenue NW, Washington, D.C. 20016.

19.     Officer Lavida Delozier ("**Defendant Officer Delozier**") was, at all times relevant to this Complaint, employed by the Metropolitan Police Department and acting in her official capacity as a police officer, under the authority and color of law and within the scope of her employment.  On February 2, 2023, Defendant Officer Delozier acted as outlined below at the Second District police station located at 3320 Idaho Avenue NW, Washington, D.C. 20016.

20.     Sergeant Denise Jackson ("**Defendant Station Sergeant**") was, at all times relevant to this Complaint, employed by the Metropolitan Police Department and acting in her official capacity as a police officer, under the authority and color of law and within the scope of her employment.  On February 2, 2023, Defendant Station Sergeant acted as outlined below at the Second District police station located at 3320 Idaho Avenue NW, Washington, D.C. 20016.

21.     Officer John Doe #1 ("**Defendant Officer John Doe #1**") was, at all times relevant to this Complaint, employed by the Metropolitan Police Department and acting in his official capacity as a police officer, under the authority and color of law and within the scope of his employment.  On February 2, 2023, Defendant Officer John Doe #1 acted as outlined below at the Second District police station located at 3320 Idaho Avenue NW, Washington, D.C. 20016.

22.     Captain Tatjana Savoy ("**Defendant Captain Savoy**"), was, at all times relevant to this Complaint, employed by the Metropolitan Police Department and acting in her official capacity as a police captain, under the authority and color of law and within the scope of her employment.  On February 2, 2023, Defendant Captain Savoy acted as outlined below at the Second District police station located at 3320 Idaho Avenue NW, Washington, D.C. 20016.

23.     Sergeant Elizabeth Wong ("**Defendant Sergeant Wong**") was, at all times relevant to this Complaint, employed by the Metropolitan Police Department and acting in her

official capacity as a police officer, under the authority and color of law and within the scope of her employment. On February 2, 2023, Defendant Sergeant Wong acted as outlined below at the Second District police station located at 3320 Idaho Avenue NW, Washington, D.C. 20016.

24.    Lieutenant Ronald Bridges ("**Defendant Lt. Bridges**") was, at all times relevant to this Complaint, employed by the Metropolitan Police Department and acting in his official capacity as a police lieutenant, under the authority and color of law and within the scope of his employment. On February 2, 2023, Defendant Lt. Bridges acted as outlined below at the Second District police station located at 3320 Idaho Avenue NW, Washington, D.C. 20016.

25.    Plaintiffs submitted several information requests under the Freedom of Information Act to the Metropolitan Police Department, including a request submitted on June 13, 2024. Despite months of continuous efforts to obtain a full and complete disclosure as required under law, the Metropolitan Police Department failed to provide any meaningful response until January 2025. However, the documents provided were significantly redacted and the MPD has failed to provide unredacted reports identifying the officers involved in this incident as required by FOIA. Accordingly, certain of the Individual Defendants listed above are sued as John and/or Jane Does.

## FACTS COMMON TO ALL COUNTS

26.    On February 2, 2023, Mr. Parker was arrested by a task force comprised by the United States Marshals Service ("USMS"), the Metropolitan Police Department ("MPD"), and the Department of Homeland Security ("DHS") on an outstanding arrest warrant. At the time he was arrested, he had been traveling into the District of Columbia with his girlfriend, and the arrest was conducted as part of a traffic stop.

27.    Mr. Parker was fully cooperative with the arrest.

28.     At the scene of the arrest, on the side of the roadway, a DHS agent conducted a search of Mr. Parker, including removing his belt, laces, and items contained within Mr. Parker's pant pockets.  However, the agent, and all other agents and officers at the scene, failed to search Mr. Parker's jacket, hooded sweater, hat, or shoes.

29.     Mr. Parker was held in the physical custody of the DHS agent and USMS Marshal Michael Lynch awaiting the arrival of a uniformed MPD police officer for prisoner transport.

30.     An MPD Sixth District Officer with call sign Wagon 61, Officer John Doe #3, arrived on scene to transport Mr. Parker.

31.     Officer John Doe #3 took physical custody of Mr. Parker and conducted a search that included patting, turning out Mr. Parker's front pant pockets, inserting his hand into the front pocket of Mr. Parker's sweater, and rubbing across the rear of Mr. Parker's jacket to frisk beneath.  However, Officer John Doe #3 failed to enter Mr. Parker's outer jacket pockets and rear pants pockets and all of Mr. Parker's items of clothing remained on his person during the search.

32.     While still on scene, Mr. Parker asked to kiss his girlfriend goodbye and told officers that he would never see her again.

33.     Officer John Doe #3 then transported Mr. Parker to the Second District police station.

34.     After arrival, Officer John Doe #3 patted Mr. Parker down once more and then escorted Mr. Parker inside the Second District cellblock vestibule where Mr. Parker was met with several other police officers assigned to the Second District station.

35.     On February 2, 2023, six employees of MPD were assigned to work in the cellblock areas: one sergeant, four officers, and one civilian.  These employees included, but are

not limited to, Defendant Officer Jenkins, Defendant Officer Delozier, and Defendant Sergeant Jackson.

36.     As one of the officers assigned to cellblock and station area duties, Defendant Officer Delozier sat at a desk in the station and would enter the cellblock throughout the day to perform duties such as prisoner checks.  In a later internal investigations interview, Defendant Officer Jenkins stated that cellblock duties were her priority when prisoners were currently detained in the cellblock and that she understood her job duties to include physically checking on any detainees every 10-15 minutes.

37.     Defendant Officer Jenkins was also assigned to the station and cellblock on February 2, 2023, with her workstation located inside the station area.  She also stated that her job duties included conducting a physical check of any detainees every 15 minutes.

38.     Defendant Officer John Doe #1 searched the pockets of Mr. Parker's outer coat and the pockets of Mr. Parker's hooded sweater, locating a small brown plastic bag in the left front pocket of the hooded sweater.

39.     When Defendant Officer John Doe #1 asked Mr. Parker about the plastic bag, Mr. Parker told Defendant Officer John Doe #1 that the contents were "just tobacco."  Mr. Parker stated that the bag was "trash," and the officer then threw the item into the trashcan.  Defendant Officer Delozier was also present, but she was not paying attention during the search and failed to ensure that a proper full custody search was completed.

40.     Defendant Officer Delozier then escorted Mr. Parker to the middle cell in the cellblock vestibule.  She stopped Mr. Parker at the entrance to Cell #3 and conducted a pat down of Mr. Parker's upper body, which solely entailed a manipulation of his outer jacket.  Mr. Parker's shackles and handcuffs were then removed.

41.    Mr. Parker was placed inside Cell #3 at approximately 8:03 a.m. and all three of the police officers in the cellblock hallway, including Defendant Officer Jenkins and Defendant Officer Delozier, left.  At that time, Mr. Parker was alive and physically well, showing no signs of physical medical distress.

42.    At no time was a full custody search of Mr. Parker ever completed.

43.    Shortly after Mr. Parker's arrival, at approximately 8:08 a.m., a female prisoner was also placed in a cell in the cellblock vestibule.  At this time, Mr. Parker and the female prisoner were the only occupants in the vestibule.

44.    A few minutes later, at approximately 8:13 a.m., Defendant Officer Delozier returned to Cell #3 and Mr. Parker asked if he could make a phone call to his girlfriend. Defendant Officer Delozier escorted Mr. Parker to the cellblock office so that Mr. Parker could place the call.

45.    The ensuing phone call lasted approximately three minutes and was audible to Defendant Officer Delozier.  Mr. Parker made several statements to his girlfriend that were picked up by her body worn camera and which she would have been able to hear, including:

    a.    "I want you to be strong."

    b.    "I'm always going to be with you."

    c.    "My energy always going to be with you."

    d.    "You can't be weak, you always got to be strong."

46.    When Mr. Parker's girlfriend repeatedly asked Mr. Parker to call her when he could, Mr. Parker replied, "I just told you baby it's an energy."  His girlfriend responded, "I love you.  Don't leave me."

11

47.    At that point, Mr. Parker began to cry and stated, "Go ahead, man."  When Mr. Parker ended the call, he was visibly crying.

48.    Defendant Officer Delozier later reported in an internal investigation interview that Mr. Parker seemed "sad" after the call and that Mr. Parker was crying.  She recalled that "Mr. Parker told his girlfriend over the phone that he loved her, to be strong, and that he would always be with her."

49.    Despite the clear indications that Mr. Parker's mental state was incredibly poor and that he was actively suicidal, the Individual Defendants continued to ignore the warning signs and proceeded with the prisoner processing of Mr. Parker.  Defendant Officers Jenkins and Delozier took Mr. Parker's mugshot and fingerprints and instructed Mr. Parker to remove his outer jacket and hat.  Mr. Parker fully complied with all directions.

50.    Mr. Parker was then informed that an MPD detective would be responding to the cellblock to interview Mr. Parker.  Mr. Parker stated that he did not wish to be interviewed.

51.    During the processing, Mr. Parker was never subjected to a full custody search. In addition, Mr. Parker was never placed on the B.O.S.S. chair, which is used to detect metal, or scanned with a metal detecting wand, and his shoes were never removed.  All the equipment, including the chair, wand, and cellblock office computer, was operable on February 2, 2023. The failure to properly search Mr. Parker was a violation of applicable rules and regulations.

52.    Defendant Officer Delozier claimed that "she recalled looking at the B.O.S.S. chair and realizing it had not been completed," but that she "felt that the arrest process was too far along to complete a B.O.S.S. scan, and it was busy."

53.     After the processing was complete, Mr. Parker was allowed to put his jacket and hat back on.  Mr. Parker washed his hands and face in the cellblock bathroom and was provided with a roll of toilet paper by Defendant Officer Delozier and wipes to clean his cell.

54.     At approximately 8:27 a.m., Mr. Parker was escorted back into Cell #3.  Mr. Parker's person and clothing were never searched before he was returned to his cell, in violation of applicable policies and procedures.

55.     At approximately 8:29 a.m., the Individual Defendants removed the female prisoner from the cellblock vestibule as Mr. Parker now occupied the adjoining cell.

56.     At approximately 8:31 a.m., all Individual Defendants present exited the cellblock.

57.     At approximately 8:32 a.m., Mr. Parker covered the CCTV camera inside Cell #3 with the toilet paper he had been provided by Defendant Officer Delozier and hung his jacket on the cell bars.

58.     Defendant Officer Jenkins belatedly saw that the CCTV footage was obscured and asked a Secret Service officer to assist her in the cellblock.  The two officers then approached Cell #3 and directed Mr. Parker to remove the items.  Defendant Officer Jenkins later reported that Mr. Parker claimed he wanted privacy while he relieved himself in the toilet.

59.     At approximately 8:36 a.m., Mr. Parker removed the toilet paper and clothing.

60.     The CCTV camera was completely obscured for approximately four minutes.

61.     Defendant Officer Jenkins and/or Defendant Officer Delozier delivered a cup of liquid to Cell #3, placing the cup on the shelf of the door before exiting the cellblock.  Mr. Parker never drank from the cup, and it remained on the shelf.

62.    Defendant Officers Jenkins and Delozier returned to their desks in the station area and worked on administrative tasks as they ate.

63.    At this time, no MPD officers were present in the cellblock.

64.    At approximately 8:39 a.m., Mr. Parker became unsteady, teetering back and forth as he stood next to the cell's bed, scratching his hands and wrists.  After about a minute, he leaned on the bed and collapsed backwards.

65.    Mr. Parker's concerning behavior prior to collapsing was fully visible on the CCTV camera.  After he collapsed, the majority of his body was not visible on camera except for the lower portion of his right leg.  This was a clear medical emergency which would have been evident to anyone watching the footage.  Despite the fact that the defendants had duties to ensure that the camera feed was continuously monitored, to actually observe events on the camera and to respond to any apparent medical emergencies, no one responded and all of these duties were violated.

66.    At approximately 8:41 a.m., Defendant Detective Lake and a Special Agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("**ATF**") went to Cell #3 to collect Mr. Parker for an interview.  When they walked into Cell #3, they discovered Mr. Parker supine on the floor parallel to the cell's bunk with his feet pointing towards the cell door and his head pointing towards the wall.

67.    Defendant Detective Lake knocked on the cell door and called out to Mr. Parker.  Mr. Parker's right foot moved slightly to the side, indicating that he was still alive.  Mr. Parker was still medically salvageable at this point in time had any of the Defendants acted to provide him with assistance including, but not limited to, administering Narcan and calling 911.  Had the Defendants taken these actions, Mr. Parker would have survived.

68.     Defendant Detective Lake unlocked the cell door, partially entered the cell, and grabbed Mr. Parker's right leg.  He shook Mr. Parker's leg for approximately ten seconds and received no response.

69.     Upon receiving no response, Defendant Detective Lake stepped out of the cell. Defendant Detective Lake and the ATF agent stood outside the cell for approximately 70 seconds staring inwards at Mr. Parker.

70.     Defendant Detective Lake re-entered Cell #3, grabbed Mr. Parker's leg once more, and shook it for approximately twenty seconds, again receiving no response.

71.     Defendant Detective Lake left the cell once again and stood with the ATF agent for another ten seconds staring at Mr. Parker.

72.     Defendant Detective Lake then closed and locked the cell door and walked away from the cell with the ATF agent.

73.     In a later interview, Defendant Detective Lake claimed that he could see Mr. Parker's chest rising and lowering.  He claimed that he grabbed Mr. Parker's leg in an effort to wake him, wanting Mr. Parker to verbalize his refusal to speak to the detective.  But Mr. Parker never opened his eyes or verbalized anything.

74.     Other than shaking Mr. Parker's right leg, Defendant Detective Lake never took any steps to assess whether Mr. Parker was in need of first aid or medical intervention, and he failed to provide any first aid or summon any medical attention despite Mr. Parker's clear medical distress and a duty to render aid immediately.

75.     At approximately 8:44 a.m., Defendant Detective Lake and the ATF agent left the cellblock vestibule after speaking with Defendant Officer Delozier manning the cellblock's vestibule window.  Defendant Detective Lake never reported to anyone that Mr. Parker was lying

on the floor of the cell on his back or that he was in medical distress, instead simply telling Defendant Officer Delozier that Mr. Parker "didn't respond" when asked if he wanted to be interviewed.

76.     While Defendant Detective Lake spoke with Defendant Officer Delozier at the cellblock's vestibule window, the ATF agent returned to Cell #3 and peered through the door at Mr. Parker.  The agent then immediately turned around and exited the cellblock.

77.     At approximately 8:46 a.m., Defendant Detective Lake and the ATF agent left the cellblock without helping Mr. Parker or seeking help for him.

78.     In a later statement, Defendant Detective Lake claimed that in his experience, "eighteen years overall with at least eight as a detective, most people are direct with not wishing to speak with him by verbalizing their refusal or requesting to speak with their lawyer." Nevertheless, despite his prior experience, he claimed to believe that Mr. Parker was "just being passive aggressive," and "was pretending to be asleep and/or ignoring them, which he found to be rude and annoying."

79.      At approximately 9:08 a.m., Defendant Officer Jenkins escorted another prisoner to Cell #1.  Even though Cell #1 is right next to Cell #3, Defendant Officer Jenkins did not walk up to or past Cell #3.

80.     At approximately 9:15 a.m., Defendant Detective Lake authored a case note that read:

> "Detective [redacted] and Agent [redacted] went into the cellblock area and observed that S-1 was lying on his back in the cell acting as if he was in a daze with his eyes closed.  Detective [redacted] could see that S-1 was seemingly conscious, due to his chest inhaling & exhaling, however S-1 when prompted by Detective [redacted] showed no signs reacting or communicating with Detective [redacted].

Detective [redacted] called out to S-1, by name several times, and went as far as opening the cell and shaking S-1's leg several times to confirm S-1 was alive. S-1 moved around several times, but at no point at time acknowledged Detective [redacted]'s presence.

Due to S-1 not giving a verbal response when asked if he would like to speak to Detective [redacted], Detective [redacted] decided that another attempt would be made to interview S-1 at a later time."

81.    Defendant Officer Jenkins and Defendant Officer Delozier exited the cellblock at 9:18 a.m. and 9:21 a.m.  No one entered the cellblock area again for almost an hour.

82.    At approximately 10:15 a.m., Defendant Officer Jenkins entered the cellblock area and spoke with other prisoners.  She did not approach Cell #3.

83.    At approximately 10:25 a.m., Defendant Officer Delozier went into the cellblock to retrieve the male prisoner in Cell #1 when she noticed that Mr. Parker was lying on the floor of Cell #3.  She banged on the cell door and called, "Hey, Marquez, Marquez."  Defendant Officer Jenkins asked her what Mr. Parker was doing, and Defendant Officer Delozier responded, "Just laying on the floor."  The male prisoner in Cell #1 was then escorted by Defendant Officer Jenkins into the cellblock office.

84.    At approximately 10:27 a.m., Defendant Officer Jenkins walked to the cellblock office and stated that "he [Mr. Parker] don't look good to me."  After escorting the male prisoner back to Cell #1, Defendant Officer Delozier unlocked the door to Cell #3 and Defendant Officer Jenkins entered and observed that Mr. Parker was not breathing.

85.    At that time, Mr. Parker appeared unconscious with his outermost jacket unzipped and his right arm near parallel with his body and his left arm extended outward.

86.    Defendant Officer Jenkins then attempted to rouse Mr. Parker, including shaking him and performing a sternum rub.

87.    When she received no response, Defendant Officer Jenkins activated the cellblock's duress alarm, and several officers responded to the cellblock. The officers retrieved an AED, which advised no shock, and administered Narcan, which had no apparent effect. Officers initiated CPR until EMS arrived at 10:37 a.m.

88.    MPD personnel who responded to Cell #3 after the alarm was pressed included Defendant Captain Savoy, Officer Fitch, Officer Hughes, Officer Brock, and Defendant Sergeant Wong. Defendant Officers Jenkins and Delozier were already present.

89.    EMS determined that Mr. Parker displayed no signs consistent with life and he was pronounced deceased at the scene at 11:08 a.m.

90.    On February 28, 2023, toxicology testing led to the determination that Mr. Parker's cause of death was the result of "combined toxic effects of cocaine, fentanyl, fluorofentanyl, and heroin."

91.    It was determined that Mr. Parker likely consumed heroin within an hour of his death.

92.    The doctor performing Mr. Parker's autopsy noted that the stimulant effect of cocaine and the depressant effect of opioids typically causes seizure-like activity, which could cause involuntary body movement.

93.    The doctor noted that Mr. Parker would likely have presented as being sleepy, drowsy, or "full on sleep," and if he had spoken, that his speech would have been slurred, and he would have been "nodding off."

94.    Numerous MPD personnel later identified that Mr. Parker's conduct was concerning. Captain John Doe #2 was the Watch Commander for the day work tour of duty on February 2, 2023. Captain John Doe #2 would typically inspect the station, including the

cellblock, before the start of his tour.  But on February 2, 2023, he became busy with an investigation and did not inspect the cellblock as usual.

95.     When Captain John Doe #2 was later interviewed during an internal investigation, he reported that he had a conversation with Defendant Detective Lake approximately thirty minutes after medical aid was finally sought for Mr. Parker, in which the detective "explained that he tried to speak with Mr. Parker, but Mr. Parker was unresponsive."  Captain John Doe #2 believed that the detective "motioned that he tried a sternum rub upon Mr. Parker because of him being unresponsive," but video of the incident demonstrates that the detective never attempted even that basic first aid response.

96.     Captain John Doe #2, who had "an extensive medical background prior to joining the MPD," reported that "his interpretation of the events described by Detective [redacted] were a red flag," and that "[t]he need to perform a sternum rub would suggest there was some diminished responsiveness that must be acted upon."  Based on his interactions with the detective, the captain "believed Mr. Parker was in medical distress" at the time the detective interacted with Mr. Parker.

97.     Defendant Station Sergeant was the sergeant assigned to the Station Sergeant day work tour of duty on February 2, 2023.  She had recently been appointed to the position on January 29, 2023.  Her tour of duty on February 2, 2023 was her second day in the position.  She was never given any training for the position and was dropped into the assignment as a fill-in. She was not familiar with the station's duties or responsibilities prior to the assignment.  She had never worked in a station or cellblock in her previous years with the department and she had never received any specific training in either of those areas.  Her superiors, MPD, and the

District of Columbia failed to properly train her before placing her in the role she held that day and failed to have a properly trained officer in that role through any other means.

98.     Defendant Station Sergeant claimed that she was aware that officers assigned to the cellblock were supposed to perform cell checks every 15 minutes and utilize CCTV monitors in the station area to view prisoners.  However, despite having supervisory responsibility over the cellblock, the sergeant did not understand the policies and practices she was obligated to ensure her officers followed: General Order 201.23 required 30-minute physical checks of prisoners as a general practice, within 10-minute checks required for any prisoner deemed "high-risk."  In fact, the sergeant was unaware at the time of all orders that pertained to the station and cellblock.

99.     In any event, the officers on duty, including, but not limited to, Defendant Officers Jenkins and Delozier, failed to follow these procedures on February 2, 2023.  Defendant Station Sergeant admitted that she had done nothing to ensure that the officers under her command performed the required checks other than periodically walk out of her office to ensure the officers where "doing their jobs."  She never observed any officer conducting the required inspections of the cellblock during her tour, she was not aware of the detective going into the cellblock during her tour, and she was not aware that there was any problem with Mr. Parker until the audible station alarm sounded.

100.    Defendant Station Sergeant was on limited duty at the time and was unable to perform an inspection of the cellblock or even enter the cellblock on February 2, 2023.  She was not aware of any deficiencies that would have prevented the officers from performing a full custody search of the prisoners, including Mr. Parker.  She was not aware that the cellblock had

not been visually checked for over an hour or that Mr. Parker was not physically checked for nearly the entire duration of his detention.

101. General Order 201.26 requires that "When a prisoner is unconscious from any cause, members should immediately try to restore consciousness and call for an ambulance. An unconscious person shall not be placed in a cell but shall be immediately transported to a medical facility for examination by a doctor." Defendants failed to adequately, timely, and competently comply with this procedure, causing the death of Mr. Parker.

102. General Order 307.02 requires that Naloxone-equipped members administer Naloxone to any individual believed to be suffering from an opioid overdose and to immediately call for emergency medical services. Defendants failed to adequately, timely, and competently comply with this procedure, causing the death of Mr. Parker.

103. General Order 307.03 requires that CPR/AED certified members apply the AED on persons who are unconscious/unresponsive and who are not breathing normally as soon as practical. Defendants failed to adequately, timely, and competently comply with this procedure, causing the death of Mr. Parker.

104. The MPD's Standard Operating Procedures relating to Holding Facilities also provides standards for holding cell operations. Defendants failed to adequately, timely, and competently comply with these procedures, causing the death of Mr. Parker.

105. In an internal investigations interview, Defendant Officer Delozier could not recall the frequency with which she conducted physical checks of detainees on February 2, 2023, and could not recall having any conversations with Mr. Parker after she escorted him to make the call to his girlfriend at 8:13 a.m.

106.    Defendant Officer Delozier further claimed that Mr. Parker was always standing up when she saw him.  Accordingly, despite being obligated to conduct physical checks of all detainees *at least* every 30 minutes, Defendant Officer Delozier could not have seen Mr. Parker between 8:40 a.m., when Mr. Parker collapsed on the floor next to the cell bunk, and 10:25 a.m., when Defendant Officer Jenkins and Defendant Officer Delozier finally found Mr. Parker unconscious and unresponsive on the floor.  During this time, at least three cell checks were required by applicable policies and procedures.  Had these checks been done, Mr. Parker would have been saved through the administration of Narcan and calling 911.

107.    In an internal investigations interview, Defendant Officer Jenkins also could not recall how many physical checks she had performed on Mr. Parker on February 2, 2023.  She admitted that the last time Mr. Parker had been checked was unknown and that no checks had been noted in the logbook between 9:08 and 10:15.  Had these checks been done, Mr. Parker would have been saved through the administration of Narcan and calling 911.

108.    All officers employed by the MPD are responsible for ensuring that all policies, procedures, and orders are upheld and are responsible for the failures outlined herein.

109.    Defendant Officer Jenkins, Defendant Officer Delozier, Defendant Detective Lake, Defendant Sergeant Jackson, Defendant Officer John Doe #1, Defendant Captain Savoy, Defendant Sergeant Wong, and Defendant Lt. Bridges all failed to ensure that the Metropolitan Police Department's policies, procedures, and orders were followed, resulting in the untimely death of Mr. Parker as outlined herein.

110.    All supervisory personnel employed by the MPD and present at the Second District station on February 2, 2023 are responsible for ensuring that the police officers under their supervision are properly trained and supervised and comply with all policies, procedures,

and orders, and complete their job duties competently, adequately, timely, and constitutionally. These duties were breached, leading to the death of Mr. Parker.

111.    Defendant Sergeant Jackson, Defendant Captain Savoy, Defendant Lt. Bridges and Defendant Sergeant Wong all failed to ensure that the police officers under their command were properly trained and complied with all policies, procedures, and orders and complete their job duties competently, adequately, timely, and constitutionally on February 2, 2023, resulting in the untimely death of Mr. Parker as outlined herein.

112.    In addition, Defendant Lt. Bridges was responsible for ensuring that a station sergeant was on duty who could enter the cellblock and ensure that the appropriate physical checks of all detainees occurred timely and competently.  Defendant Lt. Bridges breached this duty by assigning Defendant Station Sergeant to the position on February 2, 2023, who was granted the position without the proper training, without knowing or understanding the policies, procedures, and orders that applied to cellblock operations, and who was on limited duty and unable to enter the cellblock when detainees were present.  As a result, Defendant Station Sergeant and Defendant Lt. Bridges failed to ensure that these policies, procedures, and orders were followed, including, but not limited to, the 30-minute physical checks of all detainees.  The breech of these duties caused Mr. Parker's death.

113.    On January 26, 2024, the Metropolitan Police Department's Internal Affairs Division submitted a Final Investigative Report Concerning the In-Custody Death of Mr. Marquez Parker to the Director of the Disciplinary Review Division (the "**Report**").

114.    The Report identified the detective as the "member involved" in the incident and identified the detective as a member of the Metropolitan Police Department assigned to the Second District Detective's Unit who was on-duty at the time of Mr. Parker's untimely death.

115.    This Report highlighted the vast and numerous failures of the Department, which ultimately led to Mr. Parker's untimely death.

116.    As the Report outlined, the doctor performing Mr. Parker's autopsy determined that he had ingested Heroin within a little over an hour prior to his death, which would have caused the unsteadiness, unusual behavior, and collapse captured on the CCTV footage at approximately 8:39 a.m.:

> "Doctor [redacted] further explained that 6-Acetylmorphine, a Heroin metabolite, was present in Mr. Parker's blood, which would occur approximately two to six minutes after ingestion and be present for up to an hour in the bloodstream before converting again in a live person. The 6-Acetylmorphine had not converted into another substance at the time Mr. Parker died indicating he ingested Heroin within a little over an hour prior to his death. Doctor [redacted] could not state specifically how Mr. Parker ingested the opioids; however, based on the CCTV footage showing the onset of Mr. Parker's unsteadiness and eventual collapse, she believed he was experiencing the effects of opioid intoxication. (2D Cell 3 CCTV, 00:40:56) Mr. Parker's stomach did not reveal the presence of any unusual items or pill fragments. Mr. Parker was not found with drug paraphernalia or unexplained marks to his body. Doctor [redacted] cited two methods for quick absorption of opioids into the bloodstream, rectal and nasal administration. OCME did not conduct swabs of Mr. Parker's orifices for the presence of any substance."

117.    As the Report concluded, Mr. Parker ingested the opioids while in custody during the four minutes the CCTV camera was obscured with toilet paper. The CCTV camera was unobscured at the time Mr. Parker suffered the effects of ingesting the opioids, but the CCTV cameras were not being monitored at the time of his collapse.

118.    At approximately 8:39 a.m., Mr. Parker suffered the onset of his opioid overdose, which resulted in unsteadiness and collapse.

119.    At approximately 8:41 a.m., Defendant Detective Lake and ATF agent visited Mr. Parker. Defendant Detective Lake and the agent spent nearly four minutes with Mr. Parker before they left, which was nearly six minutes after Mr. Parker's collapse following the onset of

his opioid overdose.  The Report noted that during that time, "[a]t no point did Mr. Parker ever

become conscious despite Detective [redacted]'s efforts to rouse him."

120.    Before this incident, Defendant Detective Lake successfully completed first

responders training which required MPD officers to take specific steps to treat and care for

people who are unresponsive.  As summarized in the Report:

> "These combined trainings instructed members on how to treat and care for
> visibly injured persons, people with traumatic injuries, or people that are
> unresponsive, not breathing, and without a pulse, which would require the
> initiation of CPR and use of an automated external defibrillator (AED).  In the
> AHA's training module for the adult "Out-of-Hospital Chain of Survival," it
> instructed that a care provider must first recognize that a person is in cardiac
> arrest as represented by a lack of consciousness as well as abnormal breathing.
> Next, check for responsiveness by tapping and shouting.  If there is no response,
> activate the emergency response system.  After that, check for breathing by
> watching the chest for rise and fall as well as check for a pulse.  PowerPoint slides
> 8, 9, and 53 of the TECC instruction material provide specific instruction on how
> to check for responsiveness and monitoring a patient's mental state in the
> following manner: *Alert* the patient is responsive and interactive, check if patient
> will respond to *Verbal* stimuli, check if patient will respond to *Painful* stimuli,
> and their level of *Unresponsiveness* to any stimulus (AVPU)."

121.    The Report concluded that "Irrespective of Detective [redacted]'s observations or

reasonings, when Mr. Parker did not wake Detective [redacted] was required by policy to

summon an ambulance after first attempting to restore consciousness to Mr. Parker.  Detective

[redacted] relied too heavily on his visual observations and did not consider other possibilities,

which caused him to stop short of summoning an ambulance."  All of the information available

to the detective at the time "should have been a concern to Detective [redacted] . . ."

122.    The Report further concluded that the searches conducted on Mr. Parker were not

sufficient or within policy.  "At least three searches of Mr. Parker were required up until his

placement into a cell at the Second District.  The members that placed Mr. Parker under arrest

should have conducted a field search.  A second field search should have been conducted by

SPO Per General Order 502.01 [. . .]. Mr. Parker's initial on-scene field search was completed by a federal member of CARFTF who was not subject to MPD's policies on searches." The searches at the station also failed to meet policy, including the failure to complete the B.O.S.S. chair and metal detector wand portions of the full custody search.

123.    In summary, the Report noted that the following facts were established:

a.    Captain [redacted] was the Second District Watch Commander and failed to conduct a cellblock inspection at the start of the day work tour.

b.    An additional search was conducted after arrival at the Second District; however, the officers failed to follow protocol to include the use of the B.O.S.S. chair or metal detector to search Mr. Parker.

c.    At approximately 08:32 hours, Mr. Parker obscured his cell's door and CCTV camera, which was noticed and challenged by Officer [redacted]. Mr. Parker explained he obscured the cell door and camera to provide him with privacy while he used the in-cell toilet.

d.    At approximately 08:36 hours, Mr. Parker removed the items obscuring the cell door and camera.

e.    At approximately 08:39 hours, Mr. Parker was visibly unsteady on his feet as he stood in his cell. He eventually collapsed, which went unobserved.

f.    At approximately 08:41 hours, Detective [redacted] and Agent [redacted] entered the Second District's cellblock and observed Mr. Parker in an unconscious state on the floor of the cell.

g.    Detective [redacted] knocked on the cell door and called out to Mr. Parker. Mr. Parker never awoke or became alert.

h.      Detective [redacted] entered Mr. Parker's cell on two occasions and shook Mr. Parker's right foot/leg which did not awake or restore consciousness to Mr. Parker.

i.      Detective [redacted] did not request medical assistance as required by policy before Mr. Parker's consciousness was restored.

j.      At approximately 08:44 hours, Detective [redacted] secured the cell leaving Mr. Parker on the floor of cell #3, and returned to the cellblock vestibule with Agent [redacted].

k.      While at the vestibule window, Detective [redacted] spoke with Officer [redacted].  Neither Detective [redacted] nor Agent [redacted] relayed information to the station members or the station supervisor about Mr. Parker's physical state.  Detective [redacted] and Agent [redacted] exited the cellblock approximately 08:46 hours.

l.      At approximately 09:08 hours, Officers [redacted] and [redacted] entered the cellblock to process and secure a separate prisoner, but did not make a physical check of Mr. Parker in the adjoining cell.

m.      At approximately 09:08 hours, Officers [redacted] and [redacted] entered the cellblock to process and secure a separate prisoner, but did not make a physical check of Mr. Parker in the adjoining cell.

n.      At approximately 09:15 hours, Detective [redacted] composed an RMS case note about the interaction with Mr. Parker, which described Mr. Parker was alive, asleep, uncooperative and not responsive.

o.      In his IAD interview, Detective [redacted] explained he believed Mr. Parker was asleep or ignoring him through passive-aggressiveness since he had recently been cooperative with the station members. Since Mr. Parker moved slightly, pulled his leg and was breathing, he had no reason to believe Mr. Parker was in medical distress.

p.      The card reader and CCTV evidence showed that no MPD member entered the cellblock from 09:21 hours to 10:15 hours, until Officers [redacted] and [redacted] retrieved a separate prisoner.

q.      At approximately 10:25 hours, Officer [redacted] noticed that Mr. Parker was unresponsive on the floor of cell #3 and alerted Officer [redacted].

r.      Sergeant Denise [redacted] did not ensure that protocols were followed, specifically a full-custody search of Mr. Parker and a physical check of the cellblock had not been made for 54 minutes or upon Mr. Parker for one hour and thirty-six minutes.

s.      Officer [redacted] and [redacted] immediately requested DCFEMS for Mr. Parker and additional MPD members responded to the cellblock to attempt to resuscitate Mr Parker.

t.      Mr. Parker was pronounced deceased at 11:08 hours inside of the Second District's cellblock.

124.    The Report ultimately recommended that the allegation against Defendant Detective Lake for failure to follow orders, including General Order 201.26, be sustained.

## COUNT I
### Wrongful Death Claim
### (Against All Defendants)

125.    Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

126.    Defendants owed a duty to act reasonably towards Mr. Parker while Mr. Parker was within Defendants' control, care, and custody, including, but not limited to, acting within constitutional bounds and complying with all other legal obligations.

127.    Defendants' duties towards Mr. Parker included, but are not limited to:

a.    Complying with Defendants' policies and regulations to ensure the care, safety, and well-being of prisoners in their care and custody;

b.    Ensuring the accurate identification and care of high-risk prisoners, especially prisoners who have demonstrated suicidal behaviors;

c.    Conducting adequate and timely inspections of cellblocks and physical checks of prisoners to ensure prisoner safety and well-being;

d.    Conducting adequate and timely searches of prisoners and following all protocols for full custody searches and using all required search methodologies, including, but not limited to, using the B.O.S.S. chair and metal detector;

e.    Adequately, competently, and timely providing all necessary medical care to prisoners within their care and custody, including, but not limited to, following all policies and regulations requiring treatment and care for unconscious and/or unresponsive prisoners; and

f.       Adequately, competently, and timely complying with all other policies,

regulations, orders, laws, and constitutional standards that apply to the caretaking of

prisoners within Defendants' control, care, and custody.

128.     Defendants failed to comply with these duties, as described herein, which

wrongfully caused or directly contributed to the death of Mr. Parker while within Defendants'

control, care, and custody.

129.     These failures included, but are not limited to:

a.       The Individual Defendants' failure to conduct adequate and timely

searches of Mr. Parker, both at the scene of Mr. Parker's arrest and at the Second District

station, including the Individual Defendants' failure to conduct a full custody search and

utilize the B.O.S.S. chair and metal detector and the officers' failure to conduct an

adequate search after finding a plastic bag containing an unknown substance on Mr.

Parker's person.

b.       The Individual Defendants' failure to adequately and timely identify Mr.

Parker as a high-risk prisoner with suicidal behaviors and ensure the appropriate policies

and procedures would be followed to ensure his safety and well-being while in their care

and custody, after Mr. Parker demonstrated clear suicidal behavior in their presence

including, but not limited to, a phone call to his girlfriend overheard by an officer and

captured by Defendant Officer Jenkins' body camera, in which Mr. Parker was audibly

and visibly upset and evidenced a suicidal ideation.

c.       The Individual Defendants' failure to adequately and timely respond to

Mr. Parker's covering of the CCTV camera, including, but not limited to, conducting

adequate searches of Mr. Parker's person and cell, and conducting timely physical inspections as required by MPD's policies, procedures, and orders.

      d.     The Individual Defendants' failure to adequately and timely comply with General Order 201.23, which requires 30-minute physical checks of prisoners and 10-minute checks for any prisoner deemed "high-risk," which resulted in no physical check of the cellblock occurring for at least 54 minutes and no physical check of Mr. Parker occurring for at least 1 hour 36 minutes.

      e.     Defendant Detective Lake's failure to adequately, competently, and timely respond to finding Mr. Parker unconscious and/or unresponsive and on the floor of Cell #3, including, but not limited to, his failure to comply with General Order 201.26 and his failure to relay to any other station member or station supervisor about Mr. Parker's physical state.

      f.     Defendant Station Sergeant's failure to ensure that the officers and detectives within his command followed all policies, procedures, regulations, orders, laws, and constitutional standards that apply to the caretaking of prisoners within Defendants' control, care, and custody.

130.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Parker, for which Mr. Parker would have been able to maintain an action and recover damages had he lived, Mr. Parker was able to ingest opioids while within Defendants' care, custody, and control, in a sufficient amount to cause an opioid overdose and result in Mr. Parker's untimely death.

131.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Parker, for which Mr. Parker would have been able to maintain an action and

recover damages had he lived, Defendants failed to provide life-saving medical care which could have prevented Mr. Parker's untimely death after suffering an opioid overdose while within Defendants' care, custody, and control.

132.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Parker, Plaintiffs have sustained injuries including, but not limited, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of protection, and loss of parental care.

133.    As a direct and proximate result of Defendants' failures and breach of duties, Plaintiffs incurred funeral and burial expenses, bills associated with the transport of the victim resulting from his death, loss of financial support, including wages and benefits that would likely have been earned by the deceased person if he or she had lived through Mr. Parker's probable retirement age, and lost services such as support, care, companionship, training, education, personal advice, and other potential services the deceased would likely have provided for the Plaintiffs.

**WHEREFORE**, Plaintiffs seek a monetary judgment against Defendants as allowed by law within the jurisdiction of this Court, in an amount to be determined by a jury at trial, costs and interest, and any other relief deemed appropriate.

**<u>COUNT II</u>**
**Survivorship Claim**
**(Against All Defendants)**

134.    Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

135.    Plaintiff Jackson is the Personal Representative of the Estate of Marquez Antonio Parker.

136.    Defendants owed a duty to act reasonably towards Mr. Parker while Mr. Parker was within Defendants' control, care, and custody, including, but not limited to, acting within constitutional bounds and complying with all other legal obligations.

137.    Defendants' duties towards Mr. Parker included, but are not limited to:

a.    Complying with Defendants' policies and regulations to ensure the care, safety, and well-being of prisoners in their care and custody;

b.    Ensuring the accurate identification and care of high-risk prisoners, especially prisoners who have demonstrated suicidal behaviors;

c.    Conducting adequate and timely inspections of cellblocks and physical checks of prisoners to ensure prisoner safety and well-being;

d.    Conducting adequate and timely searches of prisoners and following all protocols for full custody searches and using all required search methodologies, including, but not limited to, using the B.O.S.S. chair and metal detector;

e.    Adequately, competently, and timely providing all necessary medical care to prisoners within their care and custody, including, but not limited to, following all policies and regulations requiring treatment and care for unconscious and/or unresponsive prisoners; and

f.    Adequately, competently, and timely complying with all other policies, regulations, orders, laws, and constitutional standards that apply to the caretaking of prisoners within Defendants' control, care, and custody.

138.    Defendants failed to comply with these duties, as described herein, which wrongfully caused or directly contributed to the death of Mr. Parker while within Defendants' control, care, and custody.

139.    These failures included, but are not limited to:

a.    The Individual Defendants' failure to conduct adequate and timely searches of Mr. Parker, both at the scene of Mr. Parker's arrest and at the Second District station, including the Individual Defendants' failure to conduct a full custody search and utilize the B.O.S.S. chair and metal detector and the officers' failure to conduct an adequate search after finding a plastic bag containing an unknown substance on Mr. Parker's person.

b.    The Individual Defendants' failure to adequately and timely identify Mr. Parker as a high-risk prisoner with suicidal behaviors and ensure the appropriate policies and procedures would be followed to ensure his safety and well-being while in their care and custody, after Mr. Parker demonstrated clear suicidal behavior in their presence including, but not limited to, a phone call to his girlfriend overheard by an officer and captured by Defendant Officer Jenkins' body camera, in which Mr. Parker was audibly and visibly upset and evidenced a suicidal ideation.

c.    The Individual Defendants' failure to adequately and timely respond to Mr. Parker's covering of the CCTV camera, including, but not limited to, conducting adequate searches of Mr. Parker's person and cell, and conducting timely physical inspections as required by MPD's policies, procedures, and orders.

d.    The Individual Defendants' failure to adequately and timely comply with General Order 201.23, which requires 30-minute physical checks of prisoners and 10-minute checks for any prisoner deemed "high-risk," which resulted in no physical check of the cellblock occurring for at least 54 minutes and no physical check of Mr. Parker occurring for at least 1 hour 36 minutes.

  e. Defendant Detective Lake's failure to adequately, competently, and timely respond to finding Mr. Parker unconscious and/or unresponsive and on the floor of Cell #3, including, but not limited to, his failure to comply with General Order 201.26 and his failure to relay to any other station member or station supervisor about Mr. Parker's physical state.

  f. Defendant Station Sergeant's failure to ensure that the officers and detectives within his command followed all policies, procedures, regulations, orders, laws, and constitutional standards that apply to the caretaking of prisoners within Defendants' control, care, and custody.

140. As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Parker, Mr. Parker was able to ingest opioids while within Defendants' care, custody, and control, in a sufficient amount to cause an opioid overdose and result in Mr. Parker's untimely death.

141. As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Parker, Defendants failed to provide life-saving medical care which could have prevented Mr. Parker's untimely death after suffering an opioid overdose while within Defendants' care, custody, and control.

142. As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Parker, Plaintiffs have sustained injuries including, but not limited, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of protection, and loss of parental care.

143. As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Parker, Mr. Parker experienced conscious pain and suffering both prior to his

overdose as his mental state deteriorated and after ingesting the drugs, during which time he felt extreme physical pain and mental anguish. An opioid overdose leads to a decrease in breathing rate, which causes physical pain felt long after the victim loses the ability to communicate the pain or engage in controlled movement. This was Mr. Parker's experience.

**WHEREFORE**, Plaintiffs seek a monetary judgment against Defendants as allowed by law within the jurisdiction of this Court, in an amount to be determined by a jury at trial, costs and interest, and any other relief deemed appropriate.

<u>**COUNT III**</u>
**Fourteenth Amendment Claim**
**Civil Rights Act, 42 U.S.C. § 1983**
**(Against All Individual Defendants)**

144.    Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

145.    Defendants engaged in an activity that violated Mr. Parker's rights as protected under the Constitution of the United States, violating Mr. Parker's due process rights.

146.    By the actions detailed herein, Defendants deprived Plaintiff of his Constitutional rights under the Fourteenth Amendment, including, but not limited to:

a.    Freedom from imprisonment and seizure of freehold, liberty and privilege without due process, and without judgment of his peers;

b.    Freedom from the deprivation of liberty without due process of the law, and without the judgment of his peers;

c.    Freedom from the abuse of power by law enforcement and correctional officers; and

d.    Freedom from summary punishment.

147.    These actions included, but are not limited to:

a.      The Individual Defendants' failure to conduct adequate and timely searches of Mr. Parker, both at the scene of Mr. Parker's arrest and at the Second District station, including the Individual Defendants' failure to conduct a full custody search and utilize the B.O.S.S. chair and metal detector and the officers' failure to conduct an adequate search after finding a plastic bag containing an unknown substance on Mr. Parker's person.

b.      The Individual Defendants' failure to adequately and timely identify Mr. Parker as a high-risk prisoner with suicidal behaviors and ensure the appropriate policies and procedures would be followed to ensure his safety and well-being while in their care and custody, after Mr. Parker demonstrated clear suicidal behavior in their presence including, but not limited to, a phone call to his girlfriend overheard by an officer and captured by Defendant Officer Jenkins' body camera, in which Mr. Parker was audibly and visibly upset and evidenced a suicidal ideation.

c.      The Individual Defendants' failure to adequately and timely respond to Mr. Parker's covering of the CCTV camera, including, but not limited to, conducting adequate searches of Mr. Parker's person and cell, and conducting timely physical inspections as required by MPD's policies, procedures, and orders.

d.      The Individual Defendants' failure to adequately and timely comply with General Order 201.23, which requires 30-minute physical checks of prisoners and 10-minute checks for any prisoner deemed "high-risk," which resulted in no physical check of the cellblock occurring for at least 54 minutes and no physical check of Mr. Parker occurring for at least 1 hour 36 minutes.

e.    Defendant Detective Lake's failure to adequately, competently, and timely respond to finding Mr. Parker unconscious and/or unresponsive and on the floor of Cell #3, including, but not limited to, his failure to comply with General Order 201.26 and his failure to relay to any other station member or station supervisor about Mr. Parker's physical state.

f.    Defendant Station Sergeant's failure to ensure that the officers and detectives within his command followed all policies, procedures, regulations, orders, laws, and constitutional standards that apply to the caretaking of prisoners within Defendants' control, care, and custody.

148.    Mr. Parker had the right to be free from summary punishment by Defendants.

149.    Mr. Parker had a protected property and liberty interest in his freedom, his ability to exercise his free will and domain over his person, his ability to be free from unlawful and unwelcome abuse and attack by the police and his ability to practice his chosen profession and earn a living thereby.

150.    Mr. Parker was deprived of numerous protected property and liberty interests by Defendants.

151.    Mr. Parker's rights were denied when Defendants failed to adequately, competently, and timely failed to search Mr. Parker, conduct physical checks of Mr. Parker and Cell #3, and provide life-saving medical care, in addition to the other failures, inactions, and actions described herein, despite the means and duty to do so.

152.    Mr. Parker was afforded less process than was due under law by Defendants depriving him of the rights in question.

153.    By the actions detailed above, Defendants deprived Mr. Parker of his constitutional rights including, but not limited to, freedom from abuse of power by those acting under color of state law and authority.

154.    At all relevant times hereto, Defendants acted under color of law and in a manner which was not objectively reasonable.

155.    Defendants had a duty to maintain security, prevent disturbances, ensure prisoner health and well-being, and take reasonable measures to guarantee safety of detainees, and provide necessary and life-saving medical care.

156.    Defendants were deliberately indifferent to Mr. Parker's safety, health, and well-being.

157.    Defendants' conduct subjected Mr. Parker to atypical and significant hardships, in relation to the ordinary conditions for a pre-trial detainee, which ultimately resulted in Mr. Parker's untimely death.

158.    At no time relevant to this action did Mr. Parker engage in any criminal or illegal act, or act in violation of the policies, regulations, and procedures of MPD.

159.    As a direct and proximate result of Defendants' conduct, actions, and inactions, Mr. Parker was able to ingest opioids while within Defendants' care, custody, and control, in a sufficient amount to cause an opioid overdose and result in Mr. Parker's untimely death.

160.    As a direct and proximate result of Defendants' conduct, actions, and inactions, Defendants failed to provide life-saving medical care which could have prevented Mr. Parker's untimely death after suffering an opioid overdose while within Defendants' care, custody, and control.

161.    As a direct and proximate result of Defendants' conduct, actions, and inactions, Plaintiffs have sustained injuries including, but not limited, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of protection, and loss of parental care.

**WHEREFORE**, Plaintiffs seek a monetary judgment against Defendants as allowed by law within the jurisdiction of this Court, in an amount to be determined by a jury at trial, costs and interest, and any other relief deemed appropriate.

**<ins>COUNT IV</ins>**
**Fourth Amendment Claim**
**Civil Rights Act, 42 U.S.C. § 1983**
**(Against All Individual Defendants)**

162.    Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

163.    At no time relevant to this action was Mr. Parker a threat to the safety of any police officer, himself, or others.

164.    At no time did Mr. Parker resist detention or attempt to evade detention by flight or otherwise.

165.    At the time of the events described herein, Mr. Parker had a clearly established right to be secure in his person and free from summary punishment.

166.    Any reasonable police officer or administrator knew or should have known of these rights at the time of this incident.

167.    Defendants acted unreasonably in their conduct, actions, and inactions towards Mr. Parker, subjecting him to summary punishment and violating his due process rights.

168.   Defendants were the direct cause of the constitutional violations suffered by Mr. Parker, which caused Mr. Parker's untimely death while in Defendants' care, custody, and control.

169.   Defendants are directly liable for their conduct, actions, and inactions as described herein.

170.   These actions and inactions include, but are not limited to:

a.   The Individual Defendants' failure to conduct adequate and timely searches of Mr. Parker, both at the scene of Mr. Parker's arrest and at the Second District station, including the Individual Defendants' failure to conduct a full custody search and utilize the B.O.S.S. chair and metal detector and the officers' failure to conduct an adequate search after finding a plastic bag containing an unknown substance on Mr. Parker's person.

b.   The Individual Defendants' failure to adequately and timely identify Mr. Parker as a high-risk prisoner with suicidal behaviors and ensure the appropriate policies and procedures would be followed to ensure his safety and well-being while in their care and custody, after Mr. Parker demonstrated clear suicidal behavior in their presence including, but not limited to, a phone call to his girlfriend overheard by an officer and captured by Defendant Officer Jenkins' body camera, in which Mr. Parker was audibly and visibly upset and evidenced a suicidal ideation.

c.   The Individual Defendants' failure to adequately and timely respond to Mr. Parker's covering of the CCTV camera, including, but not limited to, conducting adequate searches of Mr. Parker's person and cell, and conducting timely physical inspections as required by MPD's policies, procedures, and orders.

d.      The Individual Defendants' failure to adequately and timely comply with General Order 201.23, which requires 30-minute physical checks of prisoners and 10-minute checks for any prisoner deemed "high-risk," which resulted in no physical check of the cellblock occurring for at least 54 minutes and no physical check of Mr. Parker occurring for at least 1 hour 36 minutes.

e.      Defendant Detective Lake's failure to adequately, competently, and timely respond to finding Mr. Parker unconscious and/or unresponsive and on the floor of Cell #3, including, but not limited to, his failure to comply with General Order 201.26 and his failure to relay to any other station member or station supervisor about Mr. Parker's physical state.

f.      Defendant Station Sergeant's failure to ensure that the officers and detectives within his command followed all policies, procedures, regulations, orders, laws, and constitutional standards that apply to the caretaking of prisoners within Defendants' control, care, and custody.

171.    None of the Defendants took reasonable steps to ensure the safety and well-being of Mr. Parker, including, but not limited to, adequately, competently, and timely searching Mr. Parker, conducting physical checks of Mr. Parker and Cell #3, and rendering life-saving medical care.

172.    The acts or omissions of Defendants were the direct causes of Mr. Parker's untimely death.

173.    As a direct and proximate result of Defendants' conduct, actions, and inactions, Mr. Parker was able to ingest opioids while within Defendants' care, custody, and control, in a sufficient amount to cause an opioid overdose and result in Mr. Parker's untimely death.

174.    As a direct and proximate result of Defendants' conduct, actions, and inactions, Defendants failed to provide life-saving medical care which could have prevented Mr. Parker's untimely death after suffering an opioid overdose while within Defendants' care, custody, and control.

175.    As a direct and proximate result of Defendants' conduct, actions, and inactions, Plaintiffs have sustained injuries including, but not limited, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of protection, and loss of parental care.

**WHEREFORE**, Plaintiffs seek a monetary judgment against Defendants as allowed by law within the jurisdiction of this Court, in an amount to be determined by a jury at trial, costs and interest, and any other relief deemed appropriate.

**COUNT V**
**Eighth Amendment Claim**
**Civil Rights Act, 42 U.S.C. § 1983**
**(Against All Individual Defendants)**

176.    Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

177.    As described herein, Defendants denied rights owed to Mr. Parker while Mr. Parker was held within Defendants' care, custody, and control.

178.    Defendants' conduct, actions, and inactions were done in complete disregard for the medical and safety needs of Mr. Parker.

179.    Mr. Parker was detained under conditions which posed a substantial risk of harm.

180.    Defendants knew of and completely disregarded the risk posed to Mr. Parker.

181.    Mr. Parker was deprived of the minimal civilized measure of life's necessities by Defendants, who deliberately placed Mr. Parker in substantial risk of serious harm.

182.    Mr. Parker was deprived of the minimal civilized measure of life's necessities by Defendants, who were deliberately indifferent to Mr. Parker's serious medical needs.

183.    Defendants were aware of facts from which the inference could be drawn that a substantial risk of harm existed.

184.    Defendants deprived Mr. Parker of his right to be free from cruel and unusual punishment by the conduct, actions, and inactions described herein.

185.    Defendants engaged in the conduct, actions, and inactions described herein in bad faith, maliciously, willfully, and/or in reckless disregard to Mr. Parker's rights.

186.    As a direct and proximate result of Defendants' conduct, actions, and inactions, Mr. Parker was able to ingest opioids while within Defendants' care, custody, and control, in a sufficient amount to cause an opioid overdose and result in Mr. Parker's untimely death.

187.    As a direct and proximate result of Defendants' conduct, actions, and inactions, Defendants failed to provide life-saving medical care which could have prevented Mr. Parker's untimely death after suffering an opioid overdose while within Defendants' care, custody, and control.

188.    As a direct and proximate result of Defendants' conduct, actions, and inactions, Plaintiffs have sustained injuries including, but not limited, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of protection, and loss of parental care.

**WHEREFORE**, Plaintiffs seek a monetary judgment against Defendants as allowed by law within the jurisdiction of this Court, in an amount to be determined by a jury at trial, costs and interest and any other relief deemed appropriate.

**COUNT VI**
**Negligence Claim**
**(Against All Defendants)**

189.    Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

190.    Defendants owed a duty to act reasonably towards Mr. Parker while Mr. Parker was within Defendants' control, care, and custody, including, but not limited to, acting within constitutional bounds and complying with all other legal obligations.

191.    Defendants' duties towards Mr. Parker included, but are not limited to:

a.    Complying with Defendants' policies and regulations to ensure the care, safety, and well-being of prisoners in their care and custody;

b.    Ensuring the accurate identification and care of high-risk prisoners, especially prisoners who have demonstrated suicidal behaviors;

c.    Conducting adequate and timely inspections of cellblocks and physical checks of prisoners to ensure prisoner safety and well-being;

d.    Conducting adequate and timely searches of prisoners and following all protocols for full custody searches and using all required search methodologies, including, but not limited to, using the B.O.S.S. chair and metal detector;

e.    Adequately, competently, and timely providing all necessary medical care to prisoners within their care and custody, including, but not limited to, following all policies and regulations requiring treatment and care for unconscious and/or unresponsive prisoners; and

f.      Adequately, competently, and timely complying with all other policies, regulations, orders, laws, and constitutional standards that apply to the caretaking of prisoners within Defendants' control, care, and custody.

192.    In addition, Defendants owed Mr. Parker a duty of reasonable care due to the special relationship between Defendants and Mr. Parker.

193.    Defendants failed to comply with these duties, as described herein, which wrongfully caused or directly contributed to the death of Mr. Parker while within Defendants' control, care, and custody.

194.    These failures included, but are not limited to:

a.      The Individual Defendants' failure to conduct adequate and timely searches of Mr. Parker, both at the scene of Mr. Parker's arrest and at the Second District station, including the Individual Defendants' failure to conduct a full custody search and utilize the B.O.S.S. chair and metal detector and the officers' failure to conduct an adequate search after finding a plastic bag containing an unknown substance on Mr. Parker's person.

b.      The Individual Defendants' failure to adequately and timely identify Mr. Parker as a high-risk prisoner with suicidal behaviors and ensure the appropriate policies and procedures would be followed to ensure his safety and well-being while in their care and custody, after Mr. Parker demonstrated clear suicidal behavior in their presence including, but not limited to, a phone call to his girlfriend overheard by an officer and captured by Defendant Officer Jenkins' body camera, in which Mr. Parker was audibly and visibly upset and evidenced a suicidal ideation.

c.    The Individual Defendants' failure to adequately and timely respond to Mr. Parker's covering of the CCTV camera, including, but not limited to, conducting adequate searches of Mr. Parker's person and cell, and conducting timely physical inspections as required by MPD's policies, procedures, and orders.

d.    The Individual Defendants' failure to adequately and timely comply with General Order 201.23, which requires 30-minute physical checks of prisoners and 10-minute checks for any prisoner deemed "high-risk," which resulted in no physical check of the cellblock occurring for at least 54 minutes and no physical check of Mr. Parker occurring for at least 1 hour 36 minutes.

e.    Defendant Detective Lake's failure to adequately, competently, and timely respond to finding Mr. Parker unconscious and/or unresponsive and on the floor of Cell #3, including, but not limited to, his failure to comply with General Order 201.26 and his failure to relay to any other station member or station supervisor about Mr. Parker's physical state.

f.    Defendant Station Sergeant's failure to ensure that the officers and detectives within his command followed all policies, procedures, regulations, orders, laws, and constitutional standards that apply to the caretaking of prisoners within Defendants' control, care, and custody.

195.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Parker, Mr. Parker was able to ingest opioids while within Defendants' care, custody, and control, in a sufficient amount to cause an opioid overdose and result in Mr. Parker's untimely death.

196.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Parker, Defendants failed to provide life-saving medical care which could have prevented Mr. Parker's untimely death after suffering an opioid overdose while within Defendants' care, custody, and control.

197.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Parker, Plaintiffs have sustained injuries including, but not limited, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of protection, and loss of parental care.

**WHEREFORE**, Plaintiffs seek a monetary judgment against Defendants as allowed by law within the jurisdiction of this Court, in an amount to be determined by a jury at trial, costs and interest, and any other relief deemed appropriate.

**COUNT VII**
**Gross Negligence Claim**
**(Against All Defendants)**

198.    Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

199.    Defendants owed a duty to act reasonably towards Mr. Parker while Mr. Parker was within Defendants' control, care, and custody, including, but not limited to, acting within constitutional bounds and complying with all other legal obligations.

200.    Defendants' duties towards Mr. Parker included, but are not limited to:

a.    Complying with Defendants' policies and regulations to ensure the care, safety, and well-being of prisoners in their care and custody;

b.    Ensuring the accurate identification and care of high-risk prisoners, especially prisoners who have demonstrated suicidal behaviors;

c.      Conducting adequate and timely inspections of cellblocks and physical checks of prisoners to ensure prisoner safety and well-being;

d.      Conducting adequate and timely searches of prisoners and following all protocols for full custody searches and using all required search methodologies, including, but not limited to, using the B.O.S.S. chair and metal detector;

e.      Adequately, competently, and timely providing all necessary medical care to prisoners within their care and custody, including, but not limited to, following all policies and regulations requiring treatment and care for unconscious and/or unresponsive prisoners; and

f.      Adequately, competently, and timely complying with all other policies, regulations, orders, laws, and constitutional standards that apply to the caretaking of prisoners within Defendants' control, care, and custody.

201.    In addition, Defendants owed Mr. Parker a duty of reasonable care due to the special relationship between Defendants and Mr. Parker.

202.    Defendants acted with gross negligence when they failed to comply with these duties, as described herein, which wrongfully caused or directly contributed to the death of Mr. Parker while within Defendants' control, care, and custody.

203.    These failures included, but are not limited to:

a.      The Individual Defendants' failure to conduct adequate and timely searches of Mr. Parker, both at the scene of Mr. Parker's arrest and at the Second District station, including the Individual Defendants' failure to conduct a full custody search and utilize the B.O.S.S. chair and metal detector and the officers' failure to conduct an

adequate search after finding a plastic bag containing an unknown substance on Mr. Parker's person.

b.      The Individual Defendants' failure to adequately and timely identify Mr. Parker as a high-risk prisoner with suicidal behaviors and ensure the appropriate policies and procedures would be followed to ensure his safety and well-being while in their care and custody, after Mr. Parker demonstrated clear suicidal behavior in their presence including, but not limited to, a phone call to his girlfriend overheard by an officer and captured by Defendant Officer Jenkins' body camera, in which Mr. Parker was audibly and visibly upset and evidenced a suicidal ideation.

c.      The Individual Defendants' failure to adequately and timely respond to Mr. Parker's covering of the CCTV camera, including, but not limited to, conducting adequate searches of Mr. Parker's person and cell, and conducting timely physical inspections as required by MPD's policies, procedures, and orders.

d.      The Individual Defendants' failure to adequately and timely comply with General Order 201.23, which requires 30-minute physical checks of prisoners and 10-minute checks for any prisoner deemed "high-risk," which resulted in no physical check of the cellblock occurring for at least 54 minutes and no physical check of Mr. Parker occurring for at least 1 hour 36 minutes.

e.      Defendant Detective Lake's failure to adequately, competently, and timely respond to finding Mr. Parker unconscious and/or unresponsive and on the floor of Cell #3, including, but not limited to, his failure to comply with General Order 201.26 and his failure to relay to any other station member or station supervisor about Mr. Parker's physical state.

f.    Defendant Station Sergeant's failure to ensure that the officers and detectives within his command followed all policies, procedures, regulations, orders, laws, and constitutional standards that apply to the caretaking of prisoners within Defendants' control, care, and custody.

204.    By knowingly, intentionally, and/or with reckless disregard committing such failures and breach of duties owed to Mr. Parker, Defendants were acting with wanton and willful disregard of Mr. Parker's rights as if such rights did not exist.

205.    Defendants' conduct, actions, and inactions constituted an intentional failure to perform their duty in reckless disregard of the consequences affecting Mr. Parker's life or property. Defendants exhibited a thoughtless disregard of the consequences of their actions without any effort to avoid such consequences.

206.    In the alternative, Defendants were so utterly indifferent to Mr. Parker's rights that they acted as if such rights did not exist, resulting in Mr. Parker's untimely death.

207.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Parker, Mr. Parker was able to ingest opioids while within Defendants' care, custody, and control, in a sufficient amount to cause an opioid overdose and result in Mr. Parker's untimely death.

208.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Parker, Defendants failed to provide life-saving medical care which could have prevented Mr. Parker's untimely death after suffering an opioid overdose while within Defendants' care, custody, and control.

209.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Parker, Plaintiffs have sustained injuries including, but not limited, pecuniary loss,

mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of protection, and loss of parental care.

**WHEREFORE**, Plaintiffs seek a monetary judgment against Defendants as allowed by law within the jurisdiction of this Court, in an amount to be determined by a jury at trial, costs and interest, and any other relief deemed appropriate.

**COUNT VIII**
**Negligent Training, Supervision, Hiring, and Retention Claim**
**(Against Defendant District of Columbia, Defendant Station Sergeant, Defendant Captain Savoy, Defendant Sergeant Wong)**

210. Plaintiffs adopt and incorporate by reference every allegation contained elsewhere herein verbatim with the same effect as if fully set forth herein.

211. Defendants had a duty to use reasonable care to select employees who are competent and fit to perform the duties of a police officer, sergeant, and/or captain.

212. Individual Defendants and their supervisors referenced herein were employees of Defendants at all times relevant hereto.

213. Upon information and belief, as outlined herein, the Individual Defendants, their supervisors, and all other individuals employed by Defendants have previously committed violations such as those at issue here.

214. Upon information and belief, as outlined herein, the Individual Defendants, their supervisors, and all other individuals employed by Defendants have not been properly trained to perform their job duties.

215. Upon information and belief, as outlined herein, the Individual Defendants, their supervisors, and all other individuals employed by Defendants have been retained in, or promoted to, positions that these individuals are not trained for and cannot competently perform.

216.    Upon information and belief, as outlined herein, the Individual Defendants, their supervisors, and all other individuals employed by Defendants have previously committed violations such as those at issue here.

217.    Defendants had constructive and/or actual knowledge of their employees' previous violations, lack of training, lack of preparedness for their positions, and failure to competently perform their job duties.

218.    Defendants' constructive and/or actual knowledge of their employees' previous violations, lack of training, lack of preparedness for their positions, and failure to competently perform their job duties gives rise to a duty to duty to supervise, discipline, or terminate the employment of its employees and to enact policies and procedures to ensure that its employees competently perform their duties.

219.    Despite having the duty and authority to discipline, supervise, and terminate the employment of its employees, and to enact policies and procedures to ensure that its employees adequately and competently perform their job duties, Defendants failed to do so.

220.    As a direct and proximate result of Defendants' failures to supervise, hire, retain, and train, and failure to put into place sufficient policies and procedures to ensure that its employees performed their job duties competently, Defendants' employees were put in a position to commit the wrongs in this case.

221.    Defendants knew or should have known that its supervision and training was inadequate to ensure that its employees do not engage in unlawful, unconstitutional, or tortious conduct and that its policies and procedures were deficient to ensure that failures such as those that occurred in this case do not occur.

222.    This negligent training, supervision, hiring, and training has led to a pattern or practice of tortious conduct on the part of Defendants and their employees.

223.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Parker, Mr. Parker was able to ingest opioids while within Defendants' care, custody, and control, in a sufficient amount to cause an opioid overdose and result in Mr. Parker's untimely death.

224.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Parker, Defendants failed to provide life-saving medical care which could have prevented Mr. Parker's untimely death after suffering an opioid overdose while within Defendants' care, custody, and control.

225.    As a direct and proximate result of Defendants' failures and breach of duties owed to Mr. Parker, Plaintiffs have sustained injuries including, but not limited, pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of protection, and loss of parental care.

**WHEREFORE**, Plaintiffs seek a monetary judgment against Defendants as allowed by law within the jurisdiction of this Court, in an amount to be determined by a jury at trial, costs and interest, and any other relief deemed appropriate.

## <u>JURY TRIAL DEMAND</u>

Plaintiffs respectfully demand a jury as to all claims so triable.

Respectfully submitted,

HANSEL LAW, P.C.

*/s/ Kristen Mack*

Cary J. Hansel (Bar No. 465242)
Kristen M. Mack (Bar No. 90008006)
2514 North Charles Street
Baltimore, Maryland 21218
Phone: (301) 461-1040
Fax: (443) 451-8606
cary@hansellaw.com
kmack@hansellaw.com
*Counsel for Plaintiffs*

# Exhibit B
# (Superior Court Docket Printout)

Civil Actions

# Case Summary

## Case No. 2025-CAB-000601

| | | |
|---|---|---|
| **Marquez Antonio Parker et al. v. District of Columbia et al.** | § § § | Location: **Civil Actions** |
| | | Judicial Officer: **Scott, Ebony M** |
| | | Filed on: **01/31/2025** |

---

## Case Information

Case Type: Tort

Subtype: Wrongful Death (Non-Medical Malpractice)

Case Status: **01/31/2025 Open**

---

## Assignment Information

**Current Case Assignment**

Case Number    2025-CAB-000601

Court            Civil Actions

Date Assigned    01/31/2025

Judicial Officer   Scott, Ebony M

---

## Party Information

*Lead Attorneys*

**Plaintiff**      **Parker, Jewel**

          723 Bald Eagle Lane
          Lusby, MD 20657

**Mack, Kristen Marie**
*Retained*
443-451-8606(F)
301-461-1040(W)
HANSEL LAW, P.C.
2514 N. Charles Street
Baltimore, MD 21218
kmack@hansellaw.com

**Parker, Marquez Antonio**        **Mack, Kristen Marie**

5114 East Capital Street NE
Washington, DC 20019

*Retained*
443-451-8606(F)
301-461-1040(W)
HANSEL LAW, P.C.
2514 N. Charles Street
Baltimore, MD 21218
kmack@hansellaw.com

**Defendant**    **Bridges, Ronald**

3320 Idaho Avenue NW
Washington, DC 20016

**Delozier, Lavida**

3320 Idaho Avenue NW
Washington, DC 20016

**District of Columbia**

c/o Mayor and Office of the Attorney General
400 6th Street NW
Washington, DC 20001

**Doe #1, John**

3320 Idaho Avenue NW
Washington, DC 20016

**Jackson, Denise**

3320 Idaho Avenue NW
Washington, DC 20016

**Jenkins, Alicia**

3320 Idaho Avenue NW
Washington, DC 20016

**Lake, Oliver C.**

3320 Idaho Avenue NW
Washington, DC 20016

**Savoy, Tatjana**

3320 Idaho Avenue NW
Washington, DC 20016

**Wong, Elizabeth**

3320 Idaho Avenue NW
Washington, DC 20016

## Events and Orders of the Court

01/31/2025    
Complaint Filed
  Docketed on:    02/03/2025
  Filed by:    Plaintiff Parker, Marquez Antonio

02/03/2025    
Initial Order [Remote]    (Judicial Officer: Scott, Ebony M)

02/04/2025    
Notice to Court (Praecipe) Filed
*Notice to the Court (Praecipe) Attaching Exhibit 1 to Plaintiffs' Complaint*
  Docketed On:    02/05/2025
  Filed By:    Plaintiff Parker, Marquez Antonio;
       Plaintiff Parker, Jewel

02/13/2025    Summons Issued

03/05/2025    
Affidavit/Declaration of Service of Summons and Complaint
*Proof of Service on Defendant DeLozier*
  Docketed On:    03/06/2025
  Filed By:    Plaintiff Parker, Marquez Antonio
  Served On:    Defendant Delozier, Lavida

03/05/2025    
Affidavit/Declaration of Service of Summons and Complaint
*Proof of Service on Defendant Jenkins*
  Docketed On:    03/06/2025
  Filed By:    Plaintiff Parker, Marquez Antonio
  Served On:    Defendant Jenkins, Alicia

03/05/2025    
Affidavit/Declaration of Service of Summons and Complaint
*Proof of Service on Defendant Savoy*
  Docketed On:    03/06/2025
  Filed By:    Plaintiff Parker, Marquez Antonio
  Served On:    Defendant Savoy, Tatjana

03/05/2025    
Affidavit/Declaration of Service of Summons and Complaint
*Proof of Service on Defendant Wong*
  Docketed On:    03/06/2025
  Filed By:    Plaintiff Parker, Marquez Antonio
  Served On:    Defendant Wong, Elizabeth

03/05/2025    

    Affidavit/Declaration of Service of Summons and Complaint
       Docketed On:    03/06/2025
       Filed By:    Plaintiff Parker, Marquez Antonio
       Served On:    Defendant Jackson, Denise

03/05/2025    

    Affidavit/Declaration of Service of Summons and Complaint
       *Proof of Service on Defendant Lake*
       Docketed On:    03/06/2025
       Filed By:    Plaintiff Parker, Marquez Antonio
       Served On:    Defendant Lake, Oliver C.

03/05/2025    

    Affidavit/Declaration of Service of Summons and Complaint
       *Proof of Service on Defendant Bridges*
       Docketed On:    03/06/2025
       Filed By:    Plaintiff Parker, Marquez Antonio
       Served On:    Defendant Bridges, Ronald

03/05/2025    

    Affidavit/Declaration of Service of Summons and Complaint
       *Affidavit of Service on Defendant District of Columbia*
       Docketed On:    03/06/2025
       Filed By:    Plaintiff Parker, Marquez Antonio
       Served On:    Defendant District of Columbia

05/16/2025    

    **Remote Initial Scheduling Conference**    (9:30 AM)    (Judicial Officer: Scott, Ebony M)

---

## Financial Information

    **Plaintiff**    Parker, Marquez Antonio
    Total Financial Assessment                120.00
    Total Payments and Credits              120.00
    **Balance Due as of 03/25/2025**          **0.00**