**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MARQUEZ ANTONIO JACKSON, *et al.*,

    *Plaintiffs*,

    v.                                                No. 25-cv-00889 (DLF)

DISTRICT OF COLUMBIA, *et al.*,

    *Defendants*.

**MEMORANDUM OPINION**

Plaintiffs Marquez Antonio Jackson (individually and as the personal representative of the estate of Marquez Antonio Parker) and Jewel Parker (Ms. Parker) bring this suit against the District of Columbia and a group of Metropolitan Police Department (MPD) employees, alleging a mix of common law and constitutional claims against the defendants arising out of the death of Marquez Antonio Parker (Mr. Parker) while in police custody. Before the Court is the defendants' Motion to Dismiss. *See* Dkt. 8. For the following reasons, the Court will grant the motion in part.

**I.      BACKGROUND**

During a traffic stop on February 2, 2023, Mr. Parker was arrested on an outstanding warrant while traveling into the District of Columbia with his girlfriend. Compl. ¶ 26, Dkt. 1-1. At that time, a non-MPD law enforcement officer searched Mr. Parker, but not his "jacket, hooded sweater, hat, or shoes." *Id.* ¶ 28. When an MPD officer arrived to take physical custody of Mr. Parker and transport him to a local police station, he re-searched Mr. Parker, checking his "front pant pockets," the front pocket of his sweater, and the rear of his jacket, but not his "outer jacket pockets" or "rear pants pockets." *Id.* ¶ 31; *see id.* ¶¶ 30, 33. Mr. Parker "asked to kiss his girlfriend goodbye and told officers that he would never see her again." *Id.* ¶ 32.

The MPD officer patted Mr. Parker down again upon arrival at the police station, then escorted him to the cellblock. *Id.* ¶¶ 33–34. Once Mr. Parker was in the cellblock, defendant Officer John Doe #1 searched him and discarded a "small brown plastic bag" found on his person, *id.* ¶ 38, which Mr. Parker stated contained "just tobacco" and was "trash," *id.* ¶ 39 (citation modified). Officer John Doe #1 threw the item into a trashcan. *Id.*

Defendants Officer Delozier, Officer Jenkins, and Sergeant Jackson worked the cellblock that day. *Id.* ¶ 35. Officer Delozier and Officer Jenkins were responsible for regularly inspecting the cellblock to physically check on detainees. *Id.* ¶¶ 36–37. When Mr. Parker was transferred to an individual cell, Officer Delozier conducted a pat down of Mr. Parker's upper body by manipulating his outer jacket. *Id.* ¶¶ 40–41. A few minutes later, Officer Delozier escorted Mr. Parker to the cellblock office so that Mr. Parker could call his girlfriend. *Id.* ¶¶ 44–45. Mr. Parker cried during the call and told his girlfriend "that he loved her, to be strong, and that he would always be with her." *Id.* ¶ 48 (citation modified); *see id.* ¶¶ 45–48.

After the phone call, Officer Delozier and Officer Jenkins processed Mr. Parker, taking his mugshot and fingerprints. *Id.* ¶ 49. During processing, no one "subjected [Mr. Parker] to a full custody search," checked him for metal, or removed his shoes. *Id.* ¶ 51. Officer Delozier later recounted that she realized at the time that Mr. Parker had not been scanned for metal but "felt that the arrest process was too far along" and things were "busy." *Id.* ¶ 52 (citation modified). When told that an MPD detective would be coming to the cellblock to interview him, Mr. Parker "stated that he did not wish to be interviewed." *Id.* ¶ 50. At approximately 8:27 a.m., Mr. Parker was returned to his individual cell, though his person and clothing were not searched again. *Id.* ¶ 54.

Around 8:32 a.m., Mr. Parker covered the CCTV camera in his cell with toilet paper and hung his jacket on the cell bars. *Id.* ¶ 57. When Officer Jenkins noticed that the CCTV footage

was obscured, she directed Mr. Parker to remove the toilet paper and jacket. *Id.* ¶ 58. Mr. Parker claimed that he wanted privacy while using the toilet, *id.*, but ultimately removed the items, *id.* ¶ 59. Altogether, the CCTV camera was obscured for approximately four minutes. *Id.* ¶ 60.

Around 8:39 a.m., "Mr. Parker became unsteady, teetering back and forth as he stood next to the cell's bed, scratching his hands and wrists." *Id.* ¶ 64. A minute later, "he leaned on the bed and collapsed backwards." *Id.* "[T]he CCTV cameras were not being monitored at the time of his collapse." *Id.* ¶ 117; *see id.* ¶ 65. Around 8:41 a.m., defendant Detective Lake and a non-MPD officer approached Mr. Parker's cell to interview him and discovered him lying on the ground. *Id.* ¶ 66. Detective Lake "knocked on the cell door and called out to Mr. Parker," whose "right foot moved slightly to the side." *Id.* ¶ 67. Detective Lake partially entered the cell and shook Mr. Parker's leg for about ten seconds but did not receive a response. *Id.* ¶ 68. About a minute later, Detective Lake shook Mr. Parker's leg for about twenty seconds, again receiving no response. *Id.* ¶¶ 69–70. Detective Lake exited the cell and left with the non-MPD officer. *Id.* ¶¶ 71–72. He later stated that he had witnessed Mr. Parker's chest rising and lowering, had grabbed Mr. Parker's leg to "wake him," and had interpreted Mr. Parker's lack of response as a refusal to be interviewed. *Id.* ¶ 73; *see id.* ¶¶ 78, 80. After leaving Mr. Parker's cell, Detective Lake reported to Officer Delozier only that Mr. Parker "didn't respond when asked if he wanted to be interviewed." *Id.* ¶ 75 (citation modified).

More than one hour and thirty minutes passed, during which time several officers went in and out of the cellblock without aiding Mr. Parker. *See id.* ¶¶ 76–77, 79, 81–83. At 10:25 a.m., Officer Delozier noticed Mr. Parker on the ground and called out to him. *Id.* ¶ 83. At 10:27 a.m., Officer Jenkins remarked that Mr. Parker "don't look good" and observed that he was not breathing. *Id.* ¶ 84. She then shook him and performed a sternum rub. *Id.* ¶ 86. Receiving no response,

Officer Jenkins activated the cellblock's duress alarm. *Id.* ¶ 87. The responding officers—among whom were defendants Captain Savoy and Sergeant Wong—administered Narcan and performed CPR until emergency services arrived at 10:37 a.m. *Id.* ¶¶ 87–88. At 11:08 a.m., Mr. Parker was pronounced deceased at the scene. *Id.* ¶ 89.

On February 28, 2023, toxicology tests indicated that Mr. Parker died from the "combined toxic effects of cocaine, fentanyl, fluorofentanyl, and heroin." *Id.* ¶ 90 (citation modified). The tests further indicated that Mr. Parker had ingested heroin within one hour of his death, *id.* ¶ 91— likely in the four-minute window when the CCTV footage was obscured, *see id.* ¶¶ 116–17.

On January 26, 2024, the MPD's Internal Affairs Division completed a "Final Investigative Report" regarding Mr. Parker's death in MPD's custody. *Id.* ¶ 113; *see* Final Investigative Report Concerning the In-Custody Death of Mr. Marquez Parker (MPD Report), Dkt. 1-2.[1] The Report concluded that Detective Lake failed to adhere to MPD policy by not calling an ambulance when his first attempt to rouse Mr. Parker failed. *See* MPD Report 69–70; Compl. ¶¶ 120–21. Nonetheless, the Report concluded that there was "no evidence" that Detective Lake "was indifferent or malicious in his interaction with Mr. Parker" or "knew Mr. Parker was in medical distress and purposefully neglected his duty to provide medical care." MPD Report 69–70. It did, however, conclude that the MPD's searches of Mr. Parker were neither adequate nor within policy. *Id.* at 70–72; Compl. ¶ 122.

On January 31, 2025, the plaintiffs—Mr. Parker's son and mother—filed suit against the District of Columbia and eight MPD officers in the Superior Court of the District of Columbia,

---

[1] The Court may consider the MPD Report given that it is attached as an exhibit to the Complaint. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) ("In determining whether a complaint fails to state a claim, we may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice.").

asserting claims for wrongful death (Count I) and survivorship (Count II) against all defendants; violations of the Fourth, Eighth, and Fourteenth Amendments under 42 U.S.C. § 1983 (Counts III–V) against the individual defendants; negligence (Count VI) and gross negligence (Count VII) against all defendants; and negligent training, supervision, hiring, and retention (Count VIII) against the District and defendants Captain Savoy, Sergeant Jackson, and Sergeant Wong. *See* Compl. ¶¶ 14–24, 125–225. The plaintiffs seek monetary damages on all counts.

The defendants removed the case to this Court, *see* Notice of Removal, Dkt. 1, and moved to dismiss the plaintiffs' claims, *see* Mot. to Dismiss, Dkt. 8.

## II.    LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and a court must construe the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (per curiam) (citation modified). A court need not, however, accept "a legal conclusion couched as a factual allegation" or an inference unsupported by the facts alleged in the complaint. *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (citation modified).

5

III.    **ANALYSIS**

A.    **Non-Federal Claims (Counts I–II, VI–VIII) Against the District and the Individual Defendants in Their Official Capacities**

The defendants move to dismiss the plaintiffs' non-federal claims against the District and the individual defendants in their official capacities for failure to comply with D.C. Code § 12–309(a)'s timeliness requirement.  *See* Mem. in Supp. of Defs.' Mot. to Dismiss (Mem. in Supp. of Mot.) 11–14, Dkt. 8-1.  Section 12–309(a) provides:

> [A]n action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage.  A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section.

D.C. Code § 12–309(a).  Compliance with this requirement is "mandatory as a prerequisite" to filing tort claims against the District or District employees sued in their official capacities. *Barnhardt v. District of Columbia*, 8 A.3d 1206, 1209 (D.C. 2010) (citation modified); *see Crafton v. District of Columbia*, 132 F. Supp. 3d 1, 10 n.8 (D.D.C. 2015) (concluding that § 12–309(a) applies to official capacity suits against District employees).[2]  And the D.C. Court of Appeals has "repeatedly" held that § 12–309(a) "is to be construed narrowly against claimants." *Owens v. District of Columbia*, 993 A.2d 1085, 1088 (D.C. 2010) (citation modified).

Section 12–309(a) bars the plaintiffs' non-federal claims against the District and the individual defendants in their official capacities.  The plaintiffs did not provide the Mayor with written notice "of the approximate time, place, cause, and circumstances of the injury," and MPD's

---

[2] Compliance with § 12–309(a) is not, however, a prerequisite to federal claims, *see Brown v. United States*, 742 F.2d 1498, 1509–10 (D.C. Cir. 1984) (en banc), or personal capacity suits against District employees, *George v. Dade*, 769 A.2d 760, 761 (D.C. 2001).

Final Investigative Report—produced nearly a year after Mr. Parker's death—does not satisfy § 12–309(a)'s notice requirement because it was not made "within six months" of Mr. Parker's injuries.  D.C. Code § 12–309(a).

The plaintiffs counter that § 12–309(a)'s six-month limitation does not apply to notice provided via a written MPD report because the MPD report provision is an "exception" to the notice requirement.  Pls.' Opp'n to Defs.' Mot. to Dismiss (Pls.' Opp'n) 18, Dkt. 9; *see id.* at 18–22.  The Court disagrees.  Under the text of the statute, a claimant may not maintain an action against the District for "unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia."  D.C. Code § 12–309(a).  That notice can take two forms.  First, the claimant can "giv[e] notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage."  *Id.*  Alternatively, "[a] report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice."  *Id.*  The MPD report provision is thus not an exception to § 12–309(a)'s notice requirement, but an "alternate form of notice."  *Stone v. District of Columbia*, 237 F.2d 28, 29 n.4 (D.C. Cir. 1956) (en banc); *see Pitts v. District of Columbia*, 391 A.2d 803, 810 (D.C. 1978); *Patrick v. District of Columbia*, 126 F. Supp. 3d 132, 137 (D.D.C. 2015).

An example helps to illustrate this point.  Consider a rule that provides: "No student may attend the school field trip unless, no fewer than two days before the field trip, the student's parents have given consent in writing to the school.  A note in writing from a student aged eighteen or over is sufficient consent under this provision."  Although a written note from a student aged eighteen or over serves as an alternative to written parental consent under the rule, nothing in the student note provision purports to obviate the timing requirement in the rule's first sentence.  In

7

other words, a written note from an eighteen-year-old student submitted on the day of the field trip would not comply.

This interpretation accords with caselaw regarding other elements of § 12–309(a). In particular, the D.C. Court of Appeals has held that, "[a]lthough section 12–309 expressly provides that a written police report can be 'a sufficient notice,' the police report must contain the same information that is required in any other notice given under the statute." *Doe by Fein v. District of Columbia*, 697 A.2d 23, 27 (D.C. 1997). "Thus, in order to be considered a sufficient notice, a police report must include, in the words of the statute, 'the approximate time, place, cause, and circumstances of the injury or damage.'" *Id.* (quoting D.C. Code § 12–309(a)); *see Harris v. Bowser*, 404 F. Supp. 3d 190, 199 (D.D.C. 2019). Section 12–309(a) does not offer any textual basis upon which the Court can conclude that the substantive requirements of the written notice provision extend to the MPD report provision but the timeliness requirement does not.[3]

The plaintiffs place substantial weight on the purported purpose of § 12–309(a), noting that Congress intended the statute "to provide the District with 'reasonable notice of (an) accident so that the facts may be ascertained and, if possible, the claim adjusted.'" Pls.' Opp'n 17 (quoting *Washington v. District of Columbia*, 429 A.2d 1362, 1365 (D.C. 1981) (en banc)). Implicit in this reliance is the view that an MPD report, whenever created, adequately "protect[s] the District against unreasonable claims." *Id.* at 19 (quoting *Miller v. Spencer*, 330 A.2d 250, 252 (D.C. 1974)).

---

[3] The Court is aware of *Mazloum v. D.C. Metro. Police Dep't*, 522 F. Supp. 2d 24 (D.D.C. 2007), in which another court held that § 12–309(a)'s recipient requirement ("to the Mayor of the District of Columbia") does not apply to the MPD report provision. *Id.* at 52–53. That question is not before this Court, and *Mazloum* did not address § 12–309(a)'s timeliness requirement. *See id.* at 50 & n.12.

To the extent that statutory purpose is relevant, however, it cuts against the plaintiffs' position. The D.C. Court of Appeals has explained that Congress enacted § 12–309(a) "to protect the District of Columbia against unreasonable claims and to assist it in the defense of the public interest where claims are made within the statute of limitations but so long after the event that it is impossible for the District of Columbia to obtain evidence for use in litigation which may result." *Miller*, 330 A.2d at 251 (citation modified). Accordingly, the "purpose of the statutory notice requirement . . . is to give the District timely information concerning a claim against it, so it may adequately prepare its defense" by "conduct[ing] a prompt, properly focused investigation of the claim." *Washington*, 429 A.2d at 1366 (citation modified). The creation of an MPD report does not itself fulfill this function. Rather, an MPD report that "contain[s] information as to time, place, cause and circumstances of injury or damage with at least the same degree of specificity required of a written notice" provides the District with "actual notice" of a possible claim requiring further investigation. *Miller*, 330 A.2d at 252; *see id.* at 251–52.

The plaintiffs' proposed reading would undermine this aim. Proper notice under the statute, however made, must be sufficiently timely and sufficiently detailed to enable the District to "conduct a prompt, properly focused investigation," *Washington*, 429 A.2d at 1366, with access to evidence relevant to the possible claim, *see Miller*, 330 A.2d at 251–52. Allowing potential claimants to rely on any MPD report, no matter when prepared, would hinder the District's ability to defend against claims "made within the statute of limitations but so long after the event that it is impossible for the District of Columbia to obtain evidence for use in litigation which may result." *Id.* at 251 (citation modified).

The Court acknowledges that applying § 12–309(a)'s timeliness requirement to the MPD report provision may lead to unfavorable results. As the plaintiffs note, an MPD report "would

9

provide notice where the police move quickly and make an arrest within six months, but would not provide notice where the police undertake a lengthier investigation and make the arrest on the 181st day." Pls.' Opp'n 21–22 (emphases omitted). The plaintiffs reason that such an approach would leave potential claimants "at the mercy of the speed of bureaucracy," *id.* at 22, or, worse, encourage MPD to delay in issuing reports, *see id.* at 21. But potential claimants need not depend on prompt action from MPD—they may instead give written notice of the injury or damage. And, in any event, these policy concerns, however forceful, cannot override the statutory text, nor are they the Court's to weigh. *See BP P.L.C. v. Mayor & City Council of Balt.*, 593 U.S. 230, 245 (2021) ("[E]ven the most formidable policy arguments cannot overcome a clear statutory directive." (citation modified)); *Allman v. Snyder*, 888 A.2d 1161, 1169 (D.C. 2005) ("It is not within the judicial function to rewrite the statute or to supply omissions in it, in order to make it more fair." (citation modified)).

Because the MPD report on which the plaintiffs rely does not satisfy § 12–309(a)'s timeliness requirement, the Court will dismiss without prejudice the plaintiffs' non-federal claims against the District and the individual defendants in their official capacities. But, given the plaintiffs' representations that, "within a single day of [Mr. Parker's death], **at least nine** written police reports were made relating to this incident," Pls.' Opp'n 23; *see id.* at 23–24, the Court will entertain a motion from the plaintiffs for "limited discovery to determine which of the numerous written reports appended to the investigative report—which were not included by the District in its response to Plaintiffs' FOIA request—were submitted within the six month period," *id.* at 24; *see* Fed. R. Civ. P. 26(d)(1). The Court will also grant the plaintiffs leave to file an amended complaint to add allegations about any such police reports. *See* Fed. R. Civ. P. 15(a)(2).

**B.**     **Non-Federal Claims (Counts I–II, VI–VIII) Against the Individual Defendants in Their Personal Capacities**

The plaintiffs assert five non-federal personal capacity claims against eight MPD employees—seven named defendants and one John Doe defendant. *See* Compl. ¶¶ 17–24. These claims include wrongful death (Count I), survivorship (Count II), negligence (Count VI), and gross negligence (Count VII) against all individual defendants; and negligent training, supervision, hiring, and retention (Count VIII) against Captain Savoy, Sergeant Jackson, and Sergeant Wong. *See id.* ¶¶ 125–43, 189–225.

For the reasons that follow, the Court will dismiss the plaintiffs' standalone wrongful death and survivorship claims, Ms. Parker's non-federal claims against the individual defendants in their personal capacities, and Mr. Jackson's non-federal claims against the individual defendants in their personal capacities, except for his negligence claim as against Lieutenant Bridges, Sergeant Jackson, Detective Lake, Officer Delozier, Officer Jenkins, and Officer John Doe #1.

1.     *Proper Framework for Non-Federal Claims*

At the outset, the Court must address the proper legal framework for the plaintiffs' wrongful death (Count I), survivorship (Count II), and negligence-based (Count VI–VIII) claims. The defendants argue that the plaintiffs cannot plead these claims separately, asserting that the District of Columbia's Wrongful Death and Survivorship Acts instead provide the rights of action for the plaintiffs' common law negligence claims. *See* Mem. in Supp. of Mot. 15–16; Reply in Supp. of Defs.' Mot. to Dismiss (Reply) 7–8, Dkt. 13.

The Court agrees that the plaintiffs have pleaded three separate negligence-based claims through two statutory vehicles. D.C. law provides for two independent rights of action for negligent conduct resulting in death: one under the Wrongful Death Act, D.C. Code § 16–2701, and one under the Survivorship Act, D.C. Code § 12–101. *See Semler v. Psychiatric Inst. of*

11

*Washington, D.C., Inc.*, 575 F.2d 922, 924 (D.C. Cir. 1978).  "The Wrongful Death Act allows next of kin to recover monetary losses suffered by them as a result of the decedent's death (for example, financial support the deceased would have provided)."  *Alston v. District of Columbia*, 772 F. Supp. 3d 43, 55 (D.D.C. 2025) (emphasis omitted).  The Survivorship Act, in turn, "inures to the benefit of the decedent's estate by preserving and carrying forward the right of action which the deceased would have had, had he not died."  *Robinson v. District of Columbia*, 130 F. Supp. 3d 180, 188 (D.D.C. 2015) (emphasis omitted and citation modified); *see Henson v. W.H.H. Trice & Co.*, 466 F. Supp. 2d 187, 192 (D.D.C. 2006) ("At common law, tort claims do not survive a plaintiff's death.  However, under District of Columbia statutory law, plaintiffs may recover for torts that result in death."); *Alston*, 772 F. Supp. 3d at 55 (noting that the Act "allows the decedent's estate to sue for, among other things, injuries to the decedent that caused the decedent's death" (emphasis omitted)).  The two statutes "do not create substantive rights but rather provide remedies for tortious conduct that results in death."  *Wallace v. District of Columbia*, 685 F. Supp. 2d 104, 113 (D.D.C. 2010); *see Buruca v. District of Columbia*, 902 F. Supp. 2d 75, 87 (D.D.C. 2012) ("[N]either statute provides any substantive rights; they simply establish the procedural methods for filing suit.").  In this way, wrongful death and survivorship claims are derivative in nature—a plaintiff must have a viable underlying cause of action to proceed.  *See Wallace*, 685 F. Supp. 2d at 112–13.

Here, the relevant underlying causes of action are found in what the plaintiffs frame as their three negligence-based claims: ordinary negligence; gross negligence; and negligent training, supervision, hiring, and retention.  *See Henson*, 466 F. Supp. 2d at 192 (explaining that the Survivorship Act "is the exclusive means by which an estate may recover for common law torts resulting in the decedent's death" and "merg[ing]" the plaintiffs' common law and survivorship

12

claims); *cf. Powers–Bunce v. District of Columbia*, 479 F. Supp. 2d 146, 160 (D.D.C. 2007) (dismissing survivorship claim "for failure to state a claim because it allege[d] no underlying, substantive tort"); *Wallace*, 685 F. Supp. 2d at 113 (dismissing survivorship and wrongful death claims where "all substantive causes of action ha[d] been dismissed"); *Est. of Wilson v. District of Columbia*, No. 23-cv-1987, 2024 WL 4370850, at *5 (D.D.C. Sept. 29, 2024) (similar).

The plaintiffs argue that their wrongful death and survivorship claims are not coextensive with their negligence claims, which they contend are necessary to encompass "injuries to Mr. Parker that caused injury other than death." Pls.' Opp'n 28; *see id.* at 28–29 ("A negligence claim is much broader, intended to compensate for any injury caused by a breach of duty of care, regardless of whether such injury resulted in death or not."). The plain text of the Survivorship Act cuts against this argument. The Act provides: "On the death of a person in whose favor or against whom a right of action has accrued for any cause prior to his death, the right of action, for all such cases, survives in favor of or against the legal representative of the deceased." D.C. Code § 12–101. Nothing in the statutory text limits the plaintiffs' potential survivorship claims to those pertaining to "injuries to Mr. Parker that caused Mr. Parker's death," Pls.' Opp'n 28; *see Flythe v. District of Columbia*, 994 F. Supp. 2d 50, 76–77 (D.D.C. 2013) (survivorship action against officer proper even though officer's "actions did not cause [decedent's] death"), *rev'd in part on other grounds*, 791 F.3d 13 (D.C. Cir. 2015), and the plaintiffs have not explained how they can assert negligence claims outside of the mechanisms provided for by the Wrongful Death and Survivorship Acts.

13

Accordingly, the Court will dismiss the plaintiffs' standalone wrongful death and survivorship claims and will construe the plaintiffs' three negligence-based claims as brought under both statutes.[4]

## 2.    *Proper Defendants for Non-Federal Claims*

The defendants further argue that the plaintiffs' non-federal claims are properly asserted against the District alone.  *See* Mem. in Supp. of Mot. 16–18.  In support of that argument, the defendants cite to *Eskridge v. Jackson*, 401 A.2d 986 (D.C. 1979), in which the D.C. Court of Appeals explained that, "[g]enerally, a plaintiff can bring two types of tort actions against public officers: (1) he can sue them in their private and individual capacity; (2) he can sue them in their official capacity as municipal officers."  *Id.* at 989 n.7.  Addressing personal capacity suits, the court explained that an officer cannot be held liable for tortious acts unless "he transcended his authority and was acting beyond the scope of official duty."  *Id.*  Because the plaintiffs "do not allege any type of intentional tort or other conduct that would transcend the scope of [the individual defendants'] official duties," the defendants argue, the plaintiffs may not bring their non-federal claims against the individual defendants in their personal capacities.  Mem. in Supp. of Mot. 18.

The Court does not agree that *Eskridge* is so neatly applied.  The quoted language appears to be no more than a general statement regarding the basic contours of immunity doctrine.  *See Cooper v. O'Connor*, 99 F.2d 135, 137–38 (D.C. Cir. 1938); *Gordon v. District of Columbia*, 309 A.3d 543, 559–61 (D.C. 2024).  As the defendants have neither asserted nor briefed absolute official immunity, *see Gordon*, 309 A.3d at 559 ("[W]hen a government official seeks the

---

[4] The plaintiffs argue that their "survivorship and wrongful death claims are not solely reliant on negligence but can survive connected to any count that demonstrates . . . a wrongful act or neglect."  Pl.s' Opp'n 29.  Although the plaintiffs could have brought non-negligence claims under the Wrongful Death and Survivorship Acts, they did not do so.  *See* Compl. ¶¶ 125–43.

14

protection of absolute official immunity against a common law claim, the court must consider whether (1) the official acted within the 'outer perimeter' of his official duties, and (2) the particular government function at issue was 'discretionary' as opposed to 'ministerial.'" (citation modified)), *Eskridge* does not at this time mandate dismissal of the plaintiffs' non-federal claims against the individual defendants in their personal capacities.

### 3.    *Proper Plaintiffs for Non-Federal Claims*

Although the defendants do not contest that Mr. Parker can bring negligence-based claims under the Wrongful Death and Survivorship Acts, they argue that Ms. Parker is not a proper party to any such claims under the D.C. statutes.  Mem. in Supp. of Mot. 14–15; Reply 5–7.  The Court agrees.

"An action pursuant to [the Wrongful Death Act] shall be brought by and in the name of the personal representative of the deceased person."  D.C. Code § 16–2702.  "The term 'personal representative' has been strictly construed to mean the decedent's executor or administrator, to the exclusion of all other persons."  *Cole, Raywid & Braverman v. Quadrangle Dev. Corp.*, 444 A.2d 969, 971 n.6 (D.C. 1982).  By the plaintiffs' own representations, Mr. Jackson is "the Personal Representative of the Estate of Marquez Antonio Parker," Compl. ¶ 14; *see* Pls.' Opp'n 26, whereas Ms. Parker is only "a wrongful death beneficiary," Compl. ¶ 15; *see* Pls.' Opp'n 26. Accordingly, Ms. Parker is not a proper plaintiff to bring claims under the Wrongful Death Act.

On this record, the Court also concludes that Ms. Parker is not a proper plaintiff to bring claims under the Survivorship Act.  That statute provides that, "[o]n the death of a person in whose favor or against whom a right of action has accrued for any cause prior to his death, the right of action, for all such cases, survives in favor of or against the *legal representative* of the deceased." D.C. Code § 12–101 (emphasis added).  "[A] legal representative under the [Survivorship] Act may be any person who, whether by virtue of testamentary act or operation of law, stands in the

place of the decedent with respect to his property." *Strother v. District of Columbia*, 372 A.2d 1291, 1295–96 (D.C. 1977). That definition is more capacious than that of "personal representative," *id.* at 1296 n.7, and can encompass more than one person, *see Casey v. Ward*, 67 F. Supp. 3d 45, 51 (D.D.C. 2014) (only decedent's father "satisf[ied] the standard for 'personal representative' under the Wrongful Death Act" but decedent's father and mother "safisf[ied] the standard for 'legal representative' under the [Survivorship] Act"), *rev'd in part on other grounds sub nom.*, *Casey v. McDonald's Corp.*, 880 F.3d 564 (D.C. Cir. 2018), including personal representatives, heirs, and certain non-heir beneficiaries, *see Young v. Firemen's Ins. Co. of Washington, D.C.*, 463 A.2d 675, 676–77 (D.C. 1983); *Strother*, 372 A.2d at 1296 n.6.

Ms. Parker has not offered any facts from which the Court can infer that she is a legal representative for the purposes of the Survivorship Act. As discussed above, Ms. Parker is not Mr. Parker's personal representative. Neither is she his heir: Under D.C. law, parents cannot be heirs if the intestate, as here, had children at the time of death. *See* D.C. Code §§ 19–305, 19–306, 19–308; *Saunders v. Air Florida, Inc.*, 558 F. Supp. 1233, 1235 (D.D.C. 1983). And the plaintiffs do not plead any facts suggesting that Ms. Parker otherwise "stands in the place of [Mr. Parker] with respect to his property." *Strother*, 372 A.2d at 1296. Because the plaintiffs have not alleged any basis upon which Ms. Parker is a "legal representative" under the Survivorship Act, she is not a proper party to bring such claims. *See Levi v. Brown & Williamson Tobacco Corp.*, 851 F. Supp. 2d 8, 9 n.1 (D.D.C. 2012) (plaintiff could not bring claims under the Survivorship Act because he "d[id] not establish that he [wa]s the court-appointed personal representative of his deceased mother's estate, or that, by testamentary act or operation of law, he [wa]s authorized to bring . . . survivorship claims").

Accordingly, the Court will dismiss Ms. Parker's negligence-based claims.

4.     *Mr. Jackson's Non-Federal Claims*

Mr. Jackson's claims for negligence; gross negligence; and negligent training, supervision, hiring, and retention remain.  For the following reasons, the Court will dismiss Mr. Jackson's gross negligence and negligent training, supervision, hiring, and retention claims in full, and Mr. Jackson's negligence claim except as against Lieutenant Bridges, Sergeant Jackson, Detective Lake, Officer Delozier, Officer Jenkins, and Officer John Doe #1.

i.     Negligence Claim (Count VI)

While the defendants acknowledge that Mr. Jackson has pleaded a plausible negligence claim against Detective Lake, Officer Delozier, and Officer Jenkins—and do not raise any arguments for dismissal regarding Officer John Doe #1—they move to dismiss the claim as to Captain Savoy, Lieutenant Bridges, Sergeant Jackson, and Sergeant Wong for failure to state a claim.  Mem. in Supp. of Mot. 18–20.[5]

"To establish negligence under D.C. law, a plaintiff must prove a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach."  *Sigmund v. Starwood Urb. Retail VI, LLC*, 617 F.3d 512, 514 (D.C. Cir. 2010) (citation modified).[6]  A plaintiff asserting a personal capacity negligence

---

[5] To the extent that the defendants challenge the plaintiffs' allegations as to Detective Lake, Officer Delozier, Officer Jenkins, and Officer John Doe #1 in their reply brief, *see* Reply 9–12, those arguments come too late, *see United States v. Sitzmann*, 893 F.3d 811, 833 (D.C. Cir. 2018) ("[I]t is generally understood that arguments first raised in a reply brief are untimely." (citation modified)).

[6] While neither party addresses choice of law, the Court concludes that D.C. tort law governs in this case.  The Court "must apply the choice-of-law rules of the jurisdiction in which [it] sit[s]— namely, the District of Columbia"—which "require that [the Court] apply the tort law of the jurisdiction that has the most significant relationship to the dispute."  *Wu v. Stomber*, 750 F.3d 944, 949 (D.C. Cir. 2014) (citation modified).  That inquiry requires the Court to consider four factors: (1) "where the injury occurred"; (2) "where the conduct causing the injury occurred"; (3) "the domicile, residence, nationality, place of incorporation[,] and place of business of the

claim against a government official must allege individualized wrongdoing. *See Powers–Bunce*, 479 F. Supp. 2d at 160. "[U]se of the terms 'carelessly and negligently,' without more, [is] conclusory and do[es] not raise a cognizable claim of negligence." *District of Columbia v. Chinn*, 839 A.2d 701, 708 (D.C. 2003).

Applying that standard here, the Court will dismiss Mr. Jackson's negligence claim as to Captain Savoy and Sergeant Wong for failure to state a claim. But the Court will permit Mr. Jackson's negligence claim against Lieutenant Bridges and Sergeant Jackson to proceed, along with his negligence claim against Detective Lake, Officer Delozier, Officer Jenkins, and Officer John Doe #1, which the defendants do not challenge.

### a.   Captain Savoy and Sergeant Wong

Mr. Jackson alleges that Captain Savoy and Sergeant Wong (1) were at the police station on the day of Mr. Parker's death, *see* Compl. ¶¶ 22–23; (2) responded to Officer Jenkins's duress alarm with other MPD employees, *id.* ¶ 88; (3) alongside Lieutenant Bridges and Sergeant Jackson, "failed to ensure that the police officers under their command were properly trained and complied with all policies, procedures, and orders and complete their job duties competently, adequately, timely, and constitutionally," *id.* ¶ 111; and (4) alongside all other individual defendants, "failed to ensure that the [MPD's] policies, procedures, and orders were followed," *id.* ¶ 109; *see id.* ¶¶ 101–04, 193–94.

Mr. Jackson has failed to plead a claim of negligence against Captain Savoy and Sergeant Wong. Although he has adequately alleged that both officers had a duty of care to Mr. Parker, *see Toy v. District of Columbia*, 549 A.2d 1, 6–7 (D.C. 1988); *Powers–Bunce*, 479 F. Supp. 2d at 163,

---

parties"; and (4) "the place where the relationship is centered." *Id.* (citation modified). Here, "those factors point to D.C. law." *Id.*; *see Martin v. Omni Hotels Mgmt. Corp.*, 206 F. Supp. 3d 115, 121 n.3 (D.D.C. 2016).

his allegations regarding the officers do not "demonstrate some sort of personal involvement in" Mr. Parker's death, *Tyson v. District of Columbia*, No. 20-cv-1450, 2021 WL 860263, at *4 (D.D.C. Mar. 8, 2021). The first two allegations merely place Captain Savoy and Sergeant Wong in the vicinity of Mr. Parker's death. They do not suggest that either official "personally breached any duty owed to [Mr. Parker], or that any actions or omissions by [them] were the proximate cause of his injury." *Smith v. District of Columbia*, 149 F. Supp. 3d 128, 135 (D.D.C. 2015). *Contrast, e.g.*, *Powers–Bunce*, 479 F. Supp. 2d at 163 (complaint "adequately state[d] a claim for negligence" where it alleged that defendant officers "had a duty to follow standard MPD procedures," that they "breached that duty," and that "their breach of that duty contributed to [the decedent's] death"). And the third and fourth allegations are "formulaic" allegations insufficient to state a claim for relief. *Iqbal*, 556 U.S. at 678 (citation modified). As such, the Court will dismiss Mr. Jackson's negligence claim against Captain Savoy and Sergeant Wong.

### b.   Lieutenant Bridges

The Court will not, however, dismiss Mr. Jackson's negligence claim against Lieutenant Bridges.

Mr. Jackson alleges that Lieutenant Bridges (1) was present at the station on the day of Mr. Parker's death, Compl. ¶ 24; (2) alongside all other individual defendants, "failed to ensure that the [MPD's] policies, procedures, and orders were followed," *id.* ¶ 109; *see id.* ¶¶ 101–04, 193–94; (3) alongside Captain Savoy, Sergeant Jackson, and Sergeant Wong, failed to ensure that subordinates "were properly trained and complied with all policies, procedures, and orders," *id.* ¶ 111; *see id.* ¶ 110; and (4) breached his duty to staff "a station sergeant . . . who could enter the cellblock and ensure that the appropriate physical checks of all detainees occurred timely and competently" by assigning Sergeant Jackson, who lacked proper training, understanding of relevant policies, and access to the cellblock, *id.* ¶ 112. This staffing decision, Mr. Jackson alleges,

19

contributed to Mr. Parker's death because neither Sergeant Jackson nor Lieutenant Bridges ensured that subordinates conducted regular physical checks of detainees. *Id.*

These allegations are sufficient to state a negligence claim against Lieutenant Bridges. The defendants do not meaningfully contest that Lieutenant Bridges owed a duty of reasonable care to Mr. Parker. *See* Mem. in Supp. of Mot. 19–20; *Toy*, 549 A.2d at 6–7; *Powers–Bunce*, 479 F. Supp. 2d at 163. And by pointing to Lieutenant Bridges's allegedly defective staffing decision, Mr. Jackson properly alleges a specific action representing a breach of duty that proximately caused Mr. Parker's death. *See Powers–Bunce*, 479 F. Supp. 2d at 163.

The defendants counter that Lieutenant Bridges's actions were "too attenuated," arguing that "[t]he harm that befell Mr. Parker could not have been reasonably foreseeable" to Lieutenant Bridges when he made the staffing decision. Mem. in Supp. of Mot. 19–20. Courts typically treat foreseeability as an issue of proximate cause, *see Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 n.1 (D.C. 2011) (en banc); *Bd. of Trs. of Univ. of D.C. v. DiSalvo*, 974 A.2d 868, 871 n.1 (D.C. 2009) ("There is general support for the practice of confining foreseeability questions to the proximate cause analysis and basing the duty analysis solely on the relationship between the parties."), which is itself "generally a factual issue to be resolved by the jury" and "becomes a question of law" only in the "exceptional" case in which "no jury could make a rational finding of proximate cause," *Est. of Botvin v. Heideman, Nudelman & Kalik, P.C.*, 115 F.4th 594, 600 (D.C. Cir. 2024) (citation modified); *see id.* at 599–600; *Speights v. 800 Water St., Inc.*, 4 A.3d 471, 475 (D.C. 2010). This case is not such an exceptional case. Mr. Jackson has adequately stated his negligence claim against Lieutenant Bridges.

### c.    Sergeant Jackson

The Court will similarly deny the defendants' motion as to Mr. Jackson's negligence claim against Sergeant Jackson.

Mr. Jackson alleges that Sergeant Jackson "admitted that she had done nothing to ensure that the officers under her command performed the required checks other than periodically walk out of her office to ensure the officers where [*sic*] 'doing their jobs,'" Compl. ¶ 99, despite knowing that "officers assigned to the cellblock were supposed to perform cell checks every 15 minutes and utilize CCTV monitors in the station area to view prisoners," *id.* ¶ 98.  He further asserts that Sergeant Jackson "did not understand the policies and practices she was obligated to ensure her officers followed," including General Order 201.23, which "required 30-minute physical checks of prisoners as a general practice, within [*sic*] 10-minute checks required for any prisoner deemed 'high-risk.'"  *Id.*  He asserts that these failures "resulted in no physical check of the cellblock occurring for at least 54 minutes and no physical check of Mr. Parker occurring for at least 1 hour 36 minutes."  *Id.* ¶ 194; *see id.* ¶ 100.

Mr. Jackson has adequately stated a negligence claim as to Sergeant Jackson.  He has plausibly pleaded that Sergeant Jackson owed a duty of reasonable care toward Mr. Parker, *see Toy*, 549 A.2d at 6–7; *Powers–Bunce*, 479 F. Supp. 2d at 163, and his allegations that Sergeant Jackson failed to enforce some policies and was unaware of others plausibly "demonstrate some sort of personal involvement in" Mr. Parker's death, *Tyson*, 2021 WL 860263, at *4.  Furthermore, he has pleaded causation by alleging that Sergeant Jackson's inaction allowed the cellblock to go without "visua[l] check[s] for over an hour," Compl. ¶ 100, and that, "[h]ad these checks been done, Mr. Parker would have been saved," *id.* ¶ 106.

The defendants note that the 54-minute gap in physical checks "occurred almost 45 minutes after Mr. Parker's opioid overdose at 8:39 a.m. on drugs [that Mr. Jackson] acknowledge[s] the decedent brought into the station."  Mem. in Supp. of Mot. 20 (citation modified).  To the extent that the defendants seek to challenge proximate cause or to imply a contributory negligence

defense, their argument fails.  Only in "exceptional" cases does proximate cause or contributory negligence become a question of law that a court may resolve on a motion to dismiss.  *Est. of Botvin*, 115 F.4th at 600 (citation modified); *Paraskevaides v. Four Seasons Wash.*, 292 F.3d 886, 893 (D.C. Cir. 2002) (citation modified).  As previously stated, this case is not such a case.  The Court thus finds that Mr. Jackson's negligence claim against Sergeant Jackson may proceed.

ii.    Gross Negligence Claim (Count VII)

The Court will dismiss Mr. Jackson's gross negligence claim against the individual defendants as duplicative of his ordinary negligence claim.  "As a general rule, . . . the law of the District of Columbia does not recognize degrees of negligence."  *Hernandez v. District of Columbia*, 845 F. Supp. 2d 112, 115 (D.D.C. 2012) (citation modified).  Rather, "courts have traditionally analyzed whether a defendant acted with gross negligence only in limited circumstances where gross negligence is a specific element of a claim or defense, or for equitable reasons."  *Id.* at 116 (citation modified).  Accordingly, "where a plaintiff has already alleged a negligence claim, the Court defers to the general rule in the District of Columbia against recognizing degrees of negligence and will dismiss as duplicative [the] plaintiff's claim for gross negligence as a separate basis of liability."  *Robinson*, 130 F. Supp. 3d at 190 (citation modified).

As Mr. Jackson "has already alleged a negligence claim," and considering that gross negligence is not "a specific element to any claim or defense at issue in this litigation," the Court will "dismiss as duplicative" Mr. Jackson's gross negligence claim.  *Id.* (citation modified).  *Contrast, e.g.*, *Atkinson v. District of Columbia*, 281 A.3d 568, 570–72 (D.C. 2022) (vacating dismissal of gross negligence claim brought under D.C. Code § 2–412, which provides that, "in the case of a claim arising out of the operation of an emergency vehicle on an emergency run, the District shall be liable only for gross negligence" (citation modified)).

22

iii.     Negligent Training, Supervision, Hiring, and Retention Claim
(Count VIII)

Finally, the Court will dismiss Mr. Jackson's negligent training, supervision, hiring, and retention claim against Captain Savoy, Sergeant Jackson, and Sergeant Wong.

The elements of negligent training, supervision, hiring, and retention are substantially similar: A plaintiff must show that "an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner," and that "the employer, armed with that actual or constructive knowledge," did not adequately train, supervise, hire, or retain the employee. *Thorp v. District of Columbia*, 319 F. Supp. 3d 1, 21 (D.D.C. 2018) (citation modified) (negligent supervision and negligent retention), *aff'd*, 788 F. App'x 8 (D.C. Cir. 2019) (per curiam); *see Katz v. District of Columbia*, 285 A.3d 1289, 1317 (D.C. 2022) (negligent hiring and negligent supervision); *Lin v. District of Columbia*, 47 F.4th 828, 845–46 (D.C. Cir. 2022) (negligent supervision and negligent training).[7]   While the Court finds that Mr. Jackson may bring his negligent training, supervision, hiring, and retention claim against the individual defendants, it will dismiss his claim for failure to state a claim.

---

[7] Courts applying D.C. law, however, appear to be divided as to whether the requisite knowledge of the dangerous or incompetent behavior must predate the incident at issue. *Compare, e.g.*, *Spiller v. District of Columbia*, 302 F. Supp. 3d 240, 254–55 (D.D.C. 2018) ("Plaintiffs do not allege that the District of Columbia had 'actual or constructive knowledge' of any problematic behavior on the part of the officers in question *before* the incident at issue here."), *with Yarullina v. United States*, 770 F. Supp. 3d 205, 213–14 (D.D.C. 2025) ("Actual knowledge exists when supervisors are contemporaneously aware of misconduct and either fail to stop it or affirmatively authorize it. In contrast, constructive knowledge arises from a recurring pattern of similar misconduct." (citation modified)), *with District of Columbia v. Tulin*, 994 A.2d 788, 794–97, 800 (D.C. 2010) (suggesting that constructive knowledge can be based on conduct related to the incident at issue). Mr. Jackson's claim fails under each of these standards.

a. Proper Defendants

The defendants argue that common law negligent training, supervision, hiring, and retention claims can be brought only against employers, not employees with supervisory responsibilities. *See* Mem. in Supp. of Mot. 23–24. In particular, they note that courts assessing these common law claims under D.C. law typically frame their analyses in terms of what an employer knew or should have known and the manner in which the employer failed to train, supervise, hire, or retain. *See id.* They further assert that they are "unaware of any case law that suggests an individual supervisor, rather than an employer, may be held liable under this common law theory of recovery." *Id.* at 23.

Whether and under what circumstances an individual supervisor can be held liable for negligent training, supervision, hiring, or retention appears to be an open question under D.C. law. While it is true that "District of Columbia courts and courts in this district discuss [such claims] in the context of an employer-employee relationship," *Roe v. Wilson*, 365 F. Supp. 3d 71, 86 (D.D.C. 2019) (emphasis omitted), at least some courts have allowed the claims to proceed against individual supervisors, *see, e.g.*, *id.* at 86–87; *Marusa v. District of Columbia*, 484 F.2d 828, 830–33 (D.C. Cir. 1973); *Moore v. District of Columbia*, 79 F. Supp. 3d 121, 141–43 (D.D.C. 2015); *Linares v. Jones*, 551 F. Supp. 2d 12, 18–19 (D.D.C. 2008), *amended in part on other grounds*, No. 04-cv-0247, 2008 WL 2444679 (D.D.C. June 18, 2008); *Johnson v. District of Columbia*, No. 22-cv-3167, 2023 WL 2770392, at *7–8 (D.D.C. Apr. 4, 2023). Furthermore, "[t]he District of Columbia recognizes the tort of negligent supervision as formulated in the Second Restatement of Agency." *Tarpeh-Doe v. United States*, 28 F.3d 120, 123 (D.C. Cir. 1994). Under the Restatement, "[a] *person* conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless: (a) in giving improper or ambiguous orders or in failing to make proper regulations; or (b) in the employment of improper persons or

24

instrumentalities in work involving risk or harm to others; (c) in the supervision of the activity; or (d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control." *Id.* (emphasis added) (quoting Restatement (Second) of Agency § 213 (1957)). This standard does not appear to impose the employer-employee distinction that the defendants propose.

At this early stage, the Court preliminarily determines that Mr. Jackson "can get to court" against Captain Savoy, Sergeant Jackson, and Sergeant Wong on his common law negligent training, supervision, hiring, and retention claim. *Marusa*, 484 F.2d at 832. If appropriate, the Court will revisit this determination at summary judgment following further briefing. *See Roe*, 365 F. Supp. 3d at 87.

### b.  Captain Savoy and Sergeant Wong

Mr. Jackson fails to state a claim for negligent training, supervision, hiring, and retention against Captain Savoy and Sergeant Wong. Each of Mr. Jackson's allegations against the officers is conclusory. Although he alleges that Captain Savoy and Sergeant Wong, along with Lieutenant Bridges and Sergeant Jackson, "failed to ensure that the police officers under their command were properly trained and complied with all policies, procedures, and orders," Compl. ¶ 111, he does not offer any facts to support this allegation. His remaining allegations are even more formulaic and non-specific, as they are assertions against all "Individual Defendants" based "[u]pon information and belief." *Id.* ¶¶ 212–16; *see id.* ¶¶ 217–25. Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" fall short of the pleading standard necessary to state a plausible claim for relief. *Iqbal*, 556 U.S. at 678.

### c.  Sergeant Jackson

Mr. Jackson has likewise failed to state a negligent training, supervision, hiring, and retention claim against Sergeant Jackson. Mr. Jackson alleges that Sergeant Jackson "admitted

25

that she had done nothing to ensure that the officers under her command performed the required checks other than periodically walk out of her office to ensure the officers where [*sic*] 'doing their jobs,'" Compl. ¶ 99, even though "she was aware that officers assigned to the cellblock were supposed to perform cell checks every 15 minutes," *id.* ¶ 98, and despite the fact that "[s]he never observed any officer conducting the required inspections of the cellblock during her tour," *id.* ¶ 99. Under her supervision, Mr. Jackson contends, officers did not step into the cellblock for approximately 54 minutes, *see id.* ¶¶ 81–82, and failed to perform a physical check of Mr. Parker's cellblock "for at least 1 hour 36 minutes," *id.* ¶ 194—violations of General Order 201.23's directive to conduct physical checks on detainees at least every 30 minutes, *see, e.g.*, *id.* ¶¶ 106, 194.

These allegations, though concerning, fall short. Mr. Jackson does not allege that Sergeant Jackson knew that the officers under her supervision behaved or were behaving "in a dangerous or otherwise incompetent manner." *Thorp*, 319 F. Supp. 3d at 21. He does not, for instance, allege that Sergeant Jackson "had 'actual or constructive knowledge' of any problematic behavior on the part of the officers in question before the incident at issue here." *Spiller*, 302 F. Supp. 3d at 255 (emphasis omitted). Nor does he allege that Sergeant Jackson was "contemporaneously aware of misconduct and either fail[ed] to stop it or affirmatively authorize[d] it," *Yarullina*, 770 F. Supp. 3d at 213, or had constructive knowledge based on conduct related to the incident, *see Tulin*, 994 A.2d at 794–97, 800. Indeed, he specifically alleges that Sergeant Jackson "periodically" checked to confirm that the officers were "doing their jobs." Compl. ¶ 99 (citation modified). As currently pleaded, the Complaint does not plausibly allege that Sergeant Jackson "was on notice of any dangerous or incompetent behavior" from the officers she supervised. *Yarullina*, 770 F. Supp. 3d at 215.

26

**C.    Federal Claims (Counts III–V)**

Finally, the plaintiffs bring three § 1983 claims, asserting violations of the Fourth, Eighth, and Fourteenth Amendments.

The Court will dismiss these claims. "Section 1983 provides a remedy for an individual who has been deprived, by a person acting under color of state law, of 'any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Watson v. District of Columbia*, No. 23-cv-1670, 2024 WL 3471262, at *3 (D.D.C. July 19, 2024) (quoting 42 U.S.C. § 1983). Here, the plaintiffs have not plausibly alleged constitutional violations to support their § 1983 claims.

1.    *Scope of Claims*

Before turning to the plaintiffs' individual § 1983 claims, the Court must briefly address the capacity in which the plaintiffs purport to sue the defendants. Because an official capacity § 1983 suit is "in all respects other than name, to be treated as a suit against the [municipality]," *Kentucky v. Graham*, 473 U.S. 159, 166 (1985), a plaintiff bringing such a claim "must allege not only a violation of his rights under the Constitution or federal law, but also that the municipality's custom or policy caused the violation," *Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."). For personal capacity § 1983 claims, in contrast, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Graham*, 473 U.S. at 166. "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution," *Iqbal*, 556 U.S. at

676, and liability cannot rest on respondeat superior, *Jones v. Horne*, 634 F.3d 588, 600 (D.C. Cir. 2011).[8]

Because the plaintiffs do not allege that any "District custom or policy caused the claimed violations of [Mr. Parker's] constitutional rights," *Warren*, 353 F.3d at 39; *see also* Pls.' Opp'n 45 ("Plaintiffs did not plead a *Monell* claim."), they fail to state a claim for § 1983 liability against the individual defendants in their official capacities.  The Court will address each of the plaintiffs' personal capacity § 1983 claims in turn.

### 2.      *Eighth Amendment Claim (Count V)*

The plaintiffs allege that the individual defendants violated Mr. Parker's Eighth Amendment right to be free from cruel and unusual punishment by deliberately placing him at a "substantial risk of serious harm" that enabled him to ingest opioids.  Compl. ¶ 181; *see id.* ¶¶ 176–88.  But the proper constitutional vehicle for "the claims of pretrial detainees" like Mr. Parker is the Due Process Clause, not the Eighth Amendment.  *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *see United States v. Cole*, 459 F. Supp. 3d 116, 123 (D.D.C. 2020) (noting that the Eighth Amendment does not apply to pretrial detainees, who have not been "convict[ed] and sentence[d]" (quoting *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989))); *see* Pls.' Opp'n 42 n.5 (acknowledging that the plaintiffs "pled the Eighth Amendment claim as a belt-and-suspenders count to protect [their] interests in the event of a change in the law").  Accordingly, the Court will dismiss the plaintiffs' Eighth Amendment claim.  *See, e.g., Hardy v. District of Columbia*, 601 F. Supp. 2d 182, 187 (D.D.C. 2009).

---

[8] The defendants do not raise any arguments regarding the capacities in which Ms. Parker and Mr. Jackson can bring their § 1983 claims.  *See, e.g.*, *Robertson v. Wegmann*, 436 U.S. 584, 588–95 (1978) (discussing the survival of § 1983 claims); *Harvey v. Mohammed*, 951 F. Supp. 2d 47, 57 n.4 (D.D.C. 2013) (conducting analysis with reference to D.C. Code § 12–101).  Accordingly, the Court does not address the issue.

3.      *Fourteenth (Fifth) Amendment Claim (Count III)*

The plaintiffs also argue that the individual defendants violated Mr. Parker's due process rights by "fail[ing] to provide medical care and fail[ing] to protect a detainee in their care." Pls.' Opp'n 40.[9]  In particular, the plaintiffs allege that the individual defendants failed to (1) search Mr. Parker adequately; (2) identify him as high-risk for suicidal ideation; (3) prevent him from covering the CCTV; (4) monitor him appropriately; (5) seek timely medical help; and (6) adhere to applicable policies and procedures. *See id.*; Compl. ¶¶ 144–61.

This claim relies on two distinct theories—failure to provide medical care and general failure to protect.  For the reasons that follow, the plaintiffs have failed to allege a due process claim under either theory.

i.      Failure to Provide Medical Care

"To constitute a substantive due process violation, [a] defendant official's behavior must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Harvey v. District of Columbia*, 798 F.3d 1042, 1049 (D.C. Cir. 2015) (citation modified); *see County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).  "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, the Constitution imposes upon the State affirmative duties of care and protection with respect to that individual."  *Harvey*, 798 F.3d at 1050 (citation modified).   Under such

_____

[9] Although the Complaint sets forth a due process claim under the Fourteenth Amendment, *see* Compl. ¶¶ 144–61, the plaintiffs acknowledge that the claim should have been brought under the Fifth Amendment, Pls.' Opp'n 42; *see Butera v. District of Columbia*, 235 F.3d 637, 645 n.7 (D.C. Cir. 2001) ("While the District of Columbia is not a state, it is subject to the Due Process Clause of the Fifth Amendment.").  Given the lack of prejudice to the defendants, the Court will construe the claim as arising under the Fifth Amendment. *Cf. Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 49–50 (D.D.C. 2021) (construing a due process claim originally brought under the Fifth Amendment as arising under the Fourteenth Amendment).

29

circumstances, "governmental deliberate indifference will shock the conscience sufficiently to establish a substantive due process violation." *Id.* (citation modified); *see Lewis*, 523 U.S. at 848–49 ("[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."). "An official is deliberately indifferent when she has subjective knowledge of the plaintiff's serious medical need and recklessly disregards the excessive risk to his health or safety from that risk." *Harvey*, 798 F.3d at 1052 (citation modified). "In appropriate situations, subjective knowledge can be inferred from the obviousness of the risk." *Hardy*, 601 F. Supp. 2d at 189–90 (citation modified).

Although the individual defendants owed Mr. Parker "affirmative duties of care and protection" by virtue of his detention, *Harvey*, 798 F.3d at 1050 (citation modified); *see Harris v. District of Columbia*, 932 F.2d 10, 14 (D.C. Cir. 1991), the plaintiffs have not adequately alleged that the individual defendants were deliberately indifferent to Mr. Parker's medical needs. Nowhere do they allege that the individual defendants had subjective knowledge of Mr. Parker's physical state or medical condition, including his suicidal ideation. *See Harvey*, 798 F.3d at 1052.

Instead, the plaintiffs argue that the Court should apply the "objectively unreasonable" standard to their due process claim. *See* Pls.' Opp'n 40–41 (citation modified). In *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court held that a pretrial detainee bringing an excessive force claim under the Fourteenth Amendment's Due Process Clause need show only that the use of force was objectively unreasonable. *See id.* at 395–400. Following *Kingsley*, a number of courts have "extended *Kingsley*'s objective standard to apply to other due process claims by pre-trial detainees." *Banks v. Booth*, 468 F. Supp. 3d 101, 110 (D.D.C. 2020), *appeal dismissed as moot*, 3 F.4th 445 (D.C. Cir. 2021); *see, e.g., id.* at 109–11 (conditions of confinement); *Bah v.*

30

*District of Columbia*, No. 23-cv-1248, 2024 WL 983329, at *3–5 (D.D.C. Mar. 7, 2024) (conditions of confinement and failure to protect); *Darnell v. Pineiro*, 849 F.3d 17, 32–36 (2d Cir. 2017) (conditions of confinement); *Short v. Hartman*, 87 F.4th 593, 603–12 (4th Cir. 2023) (serious medical condition); *Westmoreland v. Butler County*, 29 F.4th 721, 726–30 (6th Cir. 2022) (failure to protect); *Kemp v. Fulton County*, 27 F.4th 491, 495–97 (7th Cir. 2022) (conditions of confinement); *Castro v. County of Los Angeles*, 833 F.3d 1060, 1067–71 (9th Cir. 2016) (en banc) (failure to protect). *But see Strain v. Regalado*, 977 F.3d 984, 989–93 (10th Cir. 2020) ("[D]eliberate indifference to a pretrial detainee's serious medical needs includes both an objective and a subjective component, even after *Kingsley*."). But in *Harvey v. District of Columbia*, 798 F.3d 1042 (D.C. Cir. 2015), issued after *Kingsley* was decided, the D.C. Circuit applied a subjective standard to a pretrial detainee's denial-of-medical-care claim. *See id.* at 1049–52. And the plaintiffs have not pointed to any subsequent D.C. Circuit caselaw applying an objective standard in that context. Absent such caselaw, the D.C. Circuit's opinion in *Harvey* binds this Court.

### ii.    Failure to Protect

A pretrial detainee asserting a failure-to-protect claim under the Fifth Amendment must allege that (1) he is detained "under conditions posing a substantial risk of serious harm"; and (2) "a prison official acted with deliberate indifference with respect to that risk." *Bah*, 2024 WL 983329, at *3 (citation modified); *see id.* at *3 n.4 (explaining that "[t]his framework originated in the Eighth Amendment context" (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994))); *Hardy*, 601 F. Supp. 2d at 188–89.[10]

---

[10] Courts have also taken different positions regarding whether and to what extent this second prong survives post-*Kingsley*. *Compare Bah*, 2024 WL 983329, at *3–5 (pretrial detainees must allege deliberate indifference, which is subject to an objective standard), *with Banks*, 468 F. Supp.

The plaintiffs' claim fails on the first prong, as they have not plausibly alleged that Mr. Parker was detained "under conditions posing a substantial risk of serious harm." *Bah*, 2024 WL 983329, at *3 (citation modified). The plaintiffs allege that Captain Savoy, Sergeant Wong, Officer Delozier, Officer Jenkins, and Officer John Doe #1 failed to adequately monitor and search Mr. Parker, *see* Compl. ¶¶ 38–40, 51–52, 54, 58–60, 65, 81–82, 101, 104–07, 109–11, 117, 147, while Sergeant Jackson failed to fulfill her supervisory duties, *see id.* ¶¶ 98–100, 147, and Lieutenant Bridges erred in staffing Sergeant Jackson, *id.* ¶ 112. But the Court cannot assess Mr. Parker's conditions of confinement through the lens of hindsight, and none of the plaintiffs' allegations suggests that Mr. Parker's conditions of confinement posed any substantial risk, whether generalized in nature or particular to him. *See Moore v. District of Columbia*, No. 25-cv-2150, 2026 WL 654355, at *4–5 (D.D.C. Mar. 9, 2026). *Contrast, e.g.*, *Bah*, 2024 WL 983329, at *5 n.7 (plaintiff alleged that there was "a general risk of inmate-on-inmate violence at the jail," that "the inmate who stabbed [him] had previously stabbed at least two other inmates," and that he "had gotten into an argument with that inmate earlier in the day in an area that should have been supervised"); *Hardy*, 601 F. Supp. 2d at 190 (plaintiffs alleged that officials knew of "significant and multiple instances of violence" yet "refused to take reasonable measures to fulfill their duty to protect inmates, such as properly screening pretrial detainees, ensuring adequate staffing at the jail, installing metal detectors, and conducting frequent 'shakedowns' of inmates and their facilities").

---

3d at 110–11 (pretrial detainees "do not need to show deliberate indifference in order to state a due process claim for inadequate conditions of confinement"). Any disagreement, however, appears to be one of form, rather than substance. *See Banks*, 468 F. Supp. 3d at 111 (pretrial detainee must still show that officials "knew or should have known that the jail conditions posed an excessive risk to their health and intentionally or recklessly failed to act"). In any event, the Court need not wade into this disagreement, as it finds that the plaintiffs have failed to allege sufficient facts to satisfy the first prong.

32

Absent allegations that the jail conditions posed a substantial risk of serious harm to Mr. Parker's health and safety, the plaintiffs have not adequately pleaded a failure-to-protect claim.

### 4.   *Fourth Amendment Claim (Count IV)*

Finally, the Court will dismiss the plaintiffs' Fourth Amendment claim. The plaintiffs assert a somewhat novel argument that the individual defendants violated Mr. Parker's Fourth Amendment rights by *not* "conduct[ing] adequate and timely searches of Mr. Parker." Compl. ¶ 170. To this Court's knowledge, there is no authority for the assertion that the Fourth Amendment gives a constitutional right *to be* searched; in fact, multiple courts have held the opposite. *See, e.g.*, *Est. of Sillah by Carter v. City of Madison*, No. 23-cv-96, 2024 WL 4650945, at *14 (W.D. Wis. Nov. 1, 2024) ("An arrestee has no general right to be searched when taken into custody."); *Lankamer v. Lalley*, No. 24-cv-506, 2024 WL 4119152, at *3 (N.D. Ill. Sep. 9, 2024) ("[T]he Court has not found one case, nor has the Estate presented a case, that establishes that the Fourth Amendment requires officers to strip search a pretrial detainee to ensure the detainee's protection."); *Purvis v. City of Orlando*, 273 F. Supp. 2d 1321, 1326 (M.D. Fla. 2003) ("The Fourth Amendment expressly protects against unreasonable searches and seizures; it does not guarantee the right to be searched and seized."). And, to the extent that the plaintiffs' Fourth Amendment claim is simply a rearticulation of their Fifth Amendment claim, the plaintiffs have not offered any authority suggesting that a pretrial detainee may bring failure-to-provide-medical-care and failure-to-protect claims under the Fourth Amendment. *Contrast, e.g.*, *Lombardo v. City of St. Louis*, 594 U.S. 464, 466 n.2 (2021) (per curiam) ("We need not address whether the Fourth or Fourteenth Amendment provides the proper basis for a claim of *excessive force* against a pretrial detainee in [the decedent's] position." (emphasis added)); *Jalloh v. Underwood*, 464 F. Supp. 3d 125, 130 (D.D.C. 2020) ("[T]he D.C. Circuit has not addressed whether an *arrestee*'s claim that authorities

33

failed to provide him medical assistance may be grounded in the Fourth Amendment." (emphasis added)).  The Court will thus dismiss the plaintiffs' Fourth Amendment claim.

## CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss, Dkt. 8, is granted in part. Counts I–V, VII, and VIII are dismissed without prejudice.  Count VI is construed as a negligence claim under the Wrongful Death and Survivorship Acts and is dismissed without prejudice except as to Mr. Jackson's negligence claim against Lieutenant Bridges, Sergeant Jackson, Detective Lake, Officer Delozier, Officer Jenkins, and Officer John Doe #1 in their personal capacities.

_____
DABNEY L. FRIEDRICH
United States District Judge

March 31, 2026

34